MAYFLOWER FARMS, INC. *v.* TEN EYCK, COMMISSIONER OF THE DEPARTMENT OF AGRICULTURE & MARKETS OF NEW YORK, ET AL.

No. 349. Argued January 15, 1936.—Decided February 10, 1936.

*Mr. Seymour Ellenbogen,* with whom *Mr. Max Cohen* was on the brief, for appellant.

*Mr. Henry S. Manley,* with whom *Mr. John J. Bennett, Jr.,* Attorney General of New York, and *Mr. Henry Epstein,* Solicitor General, were on the brief, for appellees.

Mr. Justice Roberts delivered the opinion of the Court.

The appellant is a corporation formed under the laws of New York, pursuing the business of a milk dealer in Brooklyn. It did not enter the business until the autumn of 1933, when it applied for, and was granted,

a license under the Milk Control Act of March 31, 1933. The statute having been reënacted for the year commencing April 1, 1934, the company, on April 16, 1934, sought a license under the new act. After a hearing the application was denied. The Supreme Court granted a certiorari order, and upon that order and the return the Appellate Division confirmed the order of the Department of Agriculture, and Markets refusing a license, and this action was affirmed by the Court of Appeals.

The Milk Control Act of 1933,[1] authorized a board to fix minimum prices for sales of fluid milk in bottles by dealers to stores in cities of more than one million inhabitants, with a differential of one cent per quart in favor of dealers "not having a well advertised trade name."[2] The term of the act was one year. An amended act, effective April 1, 1934,[3] which placed milk control under the jurisdiction of a division of the Department of Agriculture and Markets, contained a similar provision with respect to the differential. The pertinent section, as it stood at the time of the appellant's application for a license, follows; the words in brackets having been in the original act, but eliminated when the statute was revised in 1934, those in italics having been added by the later act:

"It shall not be unlawful for any milk dealer who [at the time this act shall take effect is] *since April tenth, nineteen hundred thirty-three has been* engaged *continuously* in the business of purchasing and handling milk not having a well advertised trade name in a city of more than one million inhabitants to sell fluid milk in bottles to stores in such city at a price not more than one cent per quart below the price of such milk sold to stores under

[1] Laws of 1933 (N. Y.) c. 158. See *Nebbia* v. *New York,* 291 U. S. 502.

[2] *Ibid.,* § 317 (c).

[3] Laws of 1934 (N. Y.) c. 126.

a well advertised trade name, *and such lower price shall also apply on sales from stores to consumers;* provided that in no event shall the price of such milk not having a well advertised trade name, be more than one cent per quart below the minimum price fixed [by the board] for such sales to stores in such a city." [4]

The appellant had not a well-advertised trade name. The reason for refusing it a license was that though it had not been continuously in the business of dealing in milk since April 10, 1933 it had sold and was selling to stores milk at a price a cent below the established minimum price. The question is whether the provision denying the benefit of the differential to all who embark in the business after April 10, 1933, works a discrimination which has no foundation in the circumstances of those engaging in the milk business in New York City, and is therefore so unreasonable as to deny appellant the equal protection of the laws in violation of the Fourteenth Amendment.

The record discloses no reason for the discrimination. The report of the committee, pursuant to which the Milk Control Act was adopted, is silent on the subject. While the legislative history indicates that the differential provision was intended to preserve competitive conditions affecting the store trade in milk, it affords no clue to the genesis of the clause denying the benefit of the differential to those entering the business after April 10, 1933.

The Court of Appeals thought a possible reason for the time limitation might be that, without it, the companies having well advertised names could, through subsidiaries, sell milk not bearing their names in competition with unadvertised dealers and thus drive some of the latter

---

[4] Laws of 1933 N. Y., c. 158, § 317 (c); Article 21–A, § 258 (q) of the Agriculture and Markets Law of the State of New York; Laws of 1934 (N. Y.) 580.

out of the field with consequent injury to the farmers who sell them milk. This view ignores the fact that the purchase price to the farmer is fixed and that the introduction of new unadvertised brands of bottled milk would not reduce the total demand for fluid milk in the metropolitan area. The appellees do not attempt now to support the provision on this ground.

Another suggested reason for the discrimination is that the legislature believed an equal price basis for all dealers would cause most of the business of selling milk through stores to pass into the hands of the large and well known dealers; the differential provision was designed to prevent this result, and save existing businesses of the independent dealers, but was limited in its scope by the reason for it; the legislature did not wish to increase the lower price competition against well advertised dealers by permitting new independent dealers to go into the business, and so required persons or corporations desiring to make investments in the milk business after April 10, 1933 to attach themselves to the higher price group. This is but another way of saying the legislature determined that during the life of the law no person or corporation might enter the business of a milk dealer in New York City. The very reason for the differential was the belief that no one could successfully market an unadvertised brand on an even price basis with the seller of a well advertised brand. One coming fresh into the field would not possess such a brand and clearly could not meet the competition of those having an established trade name and good will, unless he were allowed the same differential as others in his class. By denying him this advantage the law effectually barred him from the business.

We are referred to a host of decisions to the effect that a regulatory law may be prospective in operation and may except from its sweep those presently engaged in the calling or activity to which it is directed. Examples are stat-

utes licensing physicians and dentists, which apply only to those entering the profession subsequent to the passage of the act and exempt those then in practice, or zoning laws which exempt existing buildings, or laws forbidding slaughter houses within certain areas, but excepting existing establishments. The challenged provision is unlike such laws, since, on its face, it is not a regulation of a business or an activity in the interest of, or for the protection of, the public, but an attempt to give an economic advantage to those engaged in a given business at an arbitrary date as against all those who enter the industry after that date. The appellees do not intimate that the classification bears any relation to the public health or welfare generally; that the provision will discourage monopoly; or that it was aimed at any abuse, cognizable by law, in the milk business. In the absence of any such showing, we have no right to conjure up possible situations which might justify the discrimination. The classification is arbitrary and unreasonable and denies the appellant the equal protection of the law.

At the argument we were asked to hold that if the time limitation be bad, it is severable, and the provision for the differential, shorn of it, remains in force; and we were referred to a section of the act claimed to show the legislature so intended. While we have jurisdiction to decide the question, it is one which may appropriately be left for adjudication by the courts of New York, *Dorchy* v. *Kansas,* 264 U. S. 286, 290, 291; *Fox Film Corp.* v. *Muller,* 296 U. S. 207, 209, 210.

The judgment is reversed and the cause remanded for further proceedings not inconsistent with this opinion.

*Reversed.*

MR. JUSTICE CARDOZO, dissenting.

The judgment just announced is irreconcilable in principle with the judgment in Borden's case, *ante,* p. 251, announced a minute or so earlier.

A minimum price for fluid milk was fixed by law in April, 1933. At that time, "independents" were underselling their competitors, the dealers in well-advertised brands, by approximately a cent a quart. There was reason to believe that unless that differential was preserved, they would be driven out of business. To give them an opportunity to survive, the lawmakers maintained the differential in the City of New York, the field of keenest competition. We have learned from the opinion in Borden's case that this might lawfully be done.

The problem was then forced upon the lawmakers, what were to be the privileges of independents who came upon the scene thereafter? Were they to have the benefit of a differential though they had not invested a dollar in the milk business at the passage of the act, or were they to take the chances of defeat by rivals stronger than themselves, as they would have to do in other callings? "The Fourteenth Amendment does not protect a business against the hazards of competition." *Hegeman Farms Corp.* v. *Baldwin*, 293 U. S. 163, 170; *Public Service Comm'n* v. *Great Northern Utilities Co.*, 289 U. S. 130, 135. To concede the differential to newcomers might mean an indefinite extension of an artificial preference, thereby aggravating the handicap, the factitious barrier to expansion, for owners of established brands. There was danger that the preference would become so general as to occupy an unfair proportion of the field, the statutory norm being thus disrupted altogether. On the other hand, to refuse the differential might mean that newcomers would be deterred from putting capital and labor at the risk of such a business, and, even if they chose to do so, would wage a losing fight.

Hardships, great or little, were inevitable, whether the field of the differential was narrowed or enlarged. The legislature, and not the court, has been charged with the duty of determining their comparative extent. To some minds an expansion of the field might seem the course of

wisdom and even that of duty; to others wisdom and duty might seem to point the other way. The judicial function is discharged when it appears from a survey of the scene that the lawmakers did not play the part of arbitrary despots in choosing as they did. *S⁺andard Oil Co.* v. *Marysville,* 279 U. S. 582, 586, 587. When a line or point has to be fixed, and "there is no mathematical or logical way of fixing it precisely, the decision of the legislature must be accepted unless we can say that it is very wide of any reasonable mark." Holmes, J., in *Louisville Gas & Electric Co.* v. *Coleman,* 277 U. S. 32, 41. Cf. *Dominion Hotel* v. *Arizona,* 249 U. S. 265, 268, 269. The judgment of the court commits us to a larger rôle. In declaring the equities of newcomers to be not inferior to those of others, the judgment makes a choice between competing considerations of policy and fairness, however emphatic its professions that it applies a rule of law.

For the situation was one to tax the wisdom of the wisest. At the very least it was a situation where thoughtful and honest men might see their duty differently. The statute upheld by this court in *Nebbia* v. *New York,* 291 U. S. 502, was an experiment, and a novel one, in that form of business enterprise. Relations between groups had grown up and crystallized under cover of the regime of unrestricted competition. They were threatened with disruption by a system of regulated prices which might crowd the little dealers out and leave the strong and the rich in possession of the field. If there was to be dislocation of the price structure by the action of the state, there was a duty, or so the lawmakers might believe, to spread the consequences among the groups with a minimum of change and hence a minimum of hardship. But the position of men in business at the beginning of the change was very different from those who might go into the business afterwards. Those already there would lose something more than an opportunity for a choice between one business and another. They would lose cap-

ital already ventured; they would lose experience already bought; they would suffer the pains incidental to the sudden and enforced abandonment of an accustomed way of life. A newcomer could not pretend that he was exposed to those afflictions. Then, too, the ephemeral character of the project counted heavily in favor of the older dealers, and little in favor of a newcomer, or rather, indeed, against him. The system of regulation had been set up as a temporary one, to tide producers over the rigors of the great depression. If independents already in the field could have their business saved from ruin, it might come back to them, intact when the statute was no longer needed. Those who went into the system later would have to count the cost.

Considerations akin to these have seemed sufficient to other legislatures for drawing a distinction between an old business and a new one. They have seemed sufficient to this court in determining the validity of other acts of legislation not different in principle. *Stanley v. Public Utilities Comm'n*, 295 U. S. 76, 78; *Continental Baking Co. v. Woodring*, 286 U. S. 352, 370, 371; *Sperry & Hutchinson Co. v. Rhodes*, 220 U. S. 502, 505; *Watson v. Maryland*, 218 U. S. 173, 177, 178; cf. *Spector v. Building Inspector*, 250 Mass. 63, 70, 71; 145 N. E. 265. Independents who were in business when the statute was adopted would not have suffered a denial of a constitutional right or privilege if they had been refused a differential, though the refusal might have condemned them to a foreordained and hopeless struggle with advertised competitors stronger than themselves. For the same reason, independents starting afterwards must submit to the same chances unless their equities are as commanding as those of dealers on the scene before. It is juggling with words to say that all the independents make up a single "class," and by reason of that fact must be subjected to a single rule. Whether the class is divisible into subclasses is the very question to be answered. There may

be division and subdivision unless separation can be found to be so void of rationality as to be the expression of a whim rather than an exercise of judgment. "We have no right," it is now said, "to conjure up possible situations which might justify the discrimination." The court has taught a different doctrine in its earlier decisions. "A statutory discrimination will not be set aside as the denial of equal protection of the laws if any state of facts reasonably may be conceived to justify it." *Metropolitan Casualty Insurance Co.* v. *Brownell,* 294 U. S. 580, 584; *Rast* v. *Van Deman & Lewis Co.,* 240 U. S. 342, 357; *O'Gorman & Young* v. *Hartford Fire Insurance Co.,* 282 U. S. 251, 257; *Williams* v. *Mayor,* 289 U. S. 36, 42. On this occasion, happily, the facts are not obscure. Big dealers and little ones, newcomers in the trade and veterans, were clamorously asserting to the legislature their title to its favor. I have not seen the judicial scales so delicately poised and so accurately graduated as to balance and record the subtleties of all these rival equities, and make them ponderable and legible beyond a reasonable doubt.

To say that the statute is not void beyond a reasonable doubt is to say that it is valid.

MR. JUSTICE BRANDEIS and MR. JUSTICE STONE join in this opinion.