**DELAWARE RIVER BASIN COMMISSION,**

v.

**BUCKS COUNTY WATER & SEWER AUTHORITY, Appellant.**

No. 80–1662.

United States Court of Appeals, Third Circuit.

Argued Nov. 6, 1980.

Decided Feb. 18, 1981.

Rehearing and Rehearing En Banc Denied April 3, 1981.

Victor S. Jaczun (argued), Jaczun & Grabowski, Perkasie, Pa., for appellant.

David J. Goldberg (argued), Warren, Goldberg & Berman, Princeton, N.J., for appellee.

Before ADAMS and SLOVITER, Circuit Judges, and BROTMAN, District Judge.*

OPINION OF THE COURT

ADAMS, Circuit Judge.

The Bucks County Water and Sewer Authority (the Authority) appeals from an or-

* Honorable Stanley S. Brotman, United States District Court for the District of New Jersey, sitting by designation.

der of summary judgment entered against it by the district court. The Delaware River Basin Commission (the Commission) had sued the Authority in an attempt to impose charges for water that the City of Philadelphia had drawn from the Delaware River and sold to the Authority. Because we are not convinced that the Commission's assessment of charges against the Authority comports with the constitutional guarantee of equal protection, we vacate the judgment of the district court, 474 F.Supp. 1249, and remand.

I

From its headwaters in the Catskill Mountains of New York, the Delaware River flows generally southward, framing the greater part of the border between Pennsylvania and New Jersey before reaching the sea off the coast of Delaware. Coherent development of the River's resources proved impossible when left to the uncoordinated decisions of each of the four riparian states.[1] In order to ensure adequate management and conservation of the River and its tributaries, collectively referred to as the Delaware River Basin, the riparian states in 1961 entered into the Delaware River Basin Compact. Recognizing the federal interests in proper supervision of the River, the United States also became a party to the Compact, which was ratified by Congress pursuant to Article I, Section 10 of the Constitution.[2]

The Compact sets as its goal the "planning, conservation, utilization, development, management and control of the water resources" of the Delaware River Basin. Compact § 1.3. To accomplish these ends, the Compact establishes the Delaware River Basin Commission, whose membership includes the Governors of the four signatory states and one representative of the President. Compact § 2.1, .2. Among its powers,[3] the Commission has the authority to impose charges for the use of facilities it owns and operates. Compact § 3.7. When Congress considered the Compact, however, it limited this authority by adding Section 15.1(b), which forbids charges for water drawn from the Basin if the withdrawal "could lawfully have been made without charge on the effective date of the Compact."

During its first ten years, the Commission did not exercise its authority to levy charges for use of Basin water. In 1971, however, the Commission passed Resolution 71·4, authorizing charges. The Commission did not actually begin to collect charges until 1974, when, with the adoption of Resolution 74–6, it implemented a system of rates and exemptions for the use of the surface waters of the Delaware.[4]

The Resolution gives effect to Section 15.1(b) of the Compact by dispensing with charges for those who use, withdraw or divert water "in quantities not exceeding the legal entitlement of the user, determined as of October 27, 1961 [the effective

1. The need for regional action was evidenced by the legal controversies over use of the River's waters, two of which were resolved by the Supreme Court. *See New Jersey v. New York*, 347 U.S. 995, 74 S.Ct. 842, 98 L.Ed. 1127 (1954); *New Jersey v. New York*, 283 U.S. 336, 51 S.Ct. 478, 75 L.Ed. 1104 (1931).

2. Act of Sept. 27, 1961, Pub.L.No.87–328, 75 Stat. 688. The Compact has been codified by each of the signatory state governments. *See* Del.Code Ann. tit. 7, §§ 6501–6511 (Supp.1970); N.J.Stat.Ann. §§ 32:11D–1 to –115 (1963 F.Supp.1980); N.Y.Conserv.Law §§ 801–812 (McKinney 1967); Pa.Stat.Ann. tit. 32, §§ 815.-101 to .106 (Purdon 1967).

3. The signatory governments granted broad powers to the Commission, thereby offering the agency "a realistic opportunity to effectuate a comprehensive plan that concerned itself with water quality as well as water supply, hydroelectric power, recreational areas, wildlife conservation, and flood protection." B. Ackerman, The Uncertain Search for Environmental Quality 4 (1974).

4. Revenues obtained through water charges were intended to defray the Commission's costs of building water storage capabilities into the Blue Marsh and Beltzville Reservoirs. *See generally Borough of Morrisville v. Delaware River Basin Comm'n*, 399 F.Supp. 469, 471–75 (E.D.Pa.1975), *aff'd per curiam*, 532 F.2d 745 (3d Cir. 1976).

date of the Compact]."[5] The Resolution defines "legal entitlement" as follows:

1. "Legal entitlement" means the quantity or volume of water expressed in million gallons per month determined by the lesser of the following conditions:

(i) a valid and subsisting permit, issued under the authority of one of the signatory parties, if such permit was required as of October 27, 1961, or thereafter;

(ii) physical capability as required for such taking; or

(iii) the total allocable flow without augmentation by the Commission, using a seven-day, ten-year, low-flow criterion measured at the point of withdrawal or diversion.

Resolution 74–6 imposed a charge of $.04 per thousand gallons for surface water consumed by users and $.0004 per thousand gallons withdrawn for non-consumptive uses; these rates have since been increased to $.06 and $.0006, respectively.

In 1966, eight years before the Commission began to assess charges for use of Basin water, the Bucks County Water and Sewer Authority entered into an agreement with the City of Philadelphia, under which the City contracted to supply the Authority with 35,000,000 gallons of water per day. The Authority submitted this agreement to the Commission for approval under Section 3.8 of the Compact. The Executive Director of the Commission responded that Section 3.8, which requires the Commission's endorsement of any project "having a substantial effect on the water resources of the [B]asin," did not require review of the contract between the Authority and the City. Philadelphia began delivering water to Bucks County in 1970, and has done so continually since then.

Late in 1976, the Commission requested that the City of Philadelphia bill the Authority, based on the charges called for by Resolution 74–6, for the water the City supplied to Bucks County. Philadelphia refused, stating that it did not wish to function as a "collection agency" for the Commission. The Commission then wrote to the Authority, indicating that the Authority had no legal entitlement to any water from the Basin free of the Commission's charges, and requesting that the Authority remit to the Commission the money owed under Resolution 74–6. The Authority replied that it owed no money. It contended that the water it purchased from Philadelphia could have been withdrawn by the City free of charge on the effective date of the Compact, and hence fell within the "legal entitlement" exemption of Resolution 74–6.

The Commission eventually brought suit against both the Authority and the City of Philadelphia. Philadelphia crossclaimed against the Authority for indemnification in the event the City was held liable to the Commission. The district judge granted the Commission's motion for summary judgment.[6] Since the Authority acknowledged that neither it nor its predecessors enjoyed any independent legal entitlement to draw water from the Delaware, the district court reasoned that the Authority's claim to exemption could succeed only if, as of the effective date of the Compact, Philadelphia had "a valid and subsisting permit, issued under the Authority of Pennsylvania," to take water from the Delaware in the quantity and for the purpose comprehended by the City's agreement with Bucks County. The district court concluded, after reviewing Pennsylvania law, that the permit authorizing Philadelphia's massive daily draw from the River did not contemplate Philadelphia's resale of a portion of this water to outlying municipalities. Bucks County thus was not entitled to exemption from the Commission's charges. The court also rejected the Authority's contentions that the Commission had actually approved

5. The Resolution also provides that, in the absence of proof of a user's "legal entitlement" as of the Compact's effective date, the quantity of water exempt from charge is that user's "legal entitlement" determined as of March 31, 1971.

6. The opinion of the district court is reported at 474 F.Supp. 1249 (E.D.Pa.1979). The district court entered summary judgment against both the Authority and the City; it also granted the City's request for indemnification.

the County's use of Delaware River water free from charges, and that Section 15.1(b) of the Compact, as implemented by Resolution 74–6, violates Federal constitutional principles of equal protection.

## II

On appeal, the Authority challenges the district court's holding on the equal protection issue. The Authority does not frame its constitutional challenge as an attack on Section 15.1(b) of the Compact, however. Instead, it maintains that Resolution 74–6 implements the Compact's "grandfather" provision in an unconstitutional manner. Thus, the Authority does not contend that *any* difference in treatment as among users of Basin water would violate equal protection, but only that a discrimination based on "legal entitlement" as defined by Resolution 74–6 cannot survive constitutional scrutiny.

The Authority does not challenge the other holdings of the district court. In particular, the Authority does not press the principal argument on which it relied in the district court: that, as of the Compact's effective date, the City of Philadelphia had a valid and subsisting permit under Pennsylvania law to withdraw water from the Delaware and sell it to other municipalities. Moreover, the Authority makes no claim that, as of the effective date of the Compact, it had an independent legal entitlement to divert water from the Delaware River Basin. Both in its brief and at oral argument, the Authority acknowledged that it has never enjoyed such an entitlement. In effect, Bucks County concedes that if it were to build its own facilities for withdrawing River water, the terms and charges of Resolution 74–6 would apply to such diversions.

Just as the Authority no longer controverts the applicability of Resolution 74–6 to its purchase of Basin water, neither does it contend that in enacting Resolution 74–6 the Commission exceeded its powers under the Compact. This latter issue was presented in *Borough of Morrisville v. Delaware River Basin Comm'n*, 399 F.Supp. 469 (E.D. Pa.1975), *aff'd per curiam*, 532 F.2d 745 (3d Cir. 1976), where it was held that the Commission acted within its authority in adopting Resolution 74–6. The *Morrisville* decision helps illuminate the Authority's claim to challenge the constitutional validity only of the implementation of Section 15.1(b), rather than of the Section itself. Section 15.1(b) immunizes from water use charges any "withdrawals or diversions which could lawfully have been made without charge on the effective date of the Compact." Although use of the term "lawfully" might suggest that a user's rights under state law to withdraw water should serve as the measure of its exemption, Resolution 74–6 grants immunity only to the extent of pumping capacity for those users whose intake capabilities on the Compact's effective date fell short of the amount they were authorized by state law to withdraw. By endorsing Resolution 74–6 as a proper implementation of Section 15.1(b), the courts have indicated that the Compact tolerates measuring the extent of the "grandfather" exemption by standards other than the state law entitlement of the user. Moreover, there has been no indication that tests different from those codified in Resolution 74–6 might not also constitute proper applications of Section 15.1(b). Thus in challenging the constitutionality of exemptions based on the criteria of Resolution 74–6, the Authority need not necessarily challenge the constitutionality of Section 15.1(b) itself, since there might be other methods of implementing the Section that are consistent both with the Compact and the Constitution.

We note that the constitutional challenge the Authority raises was not presented in *Borough of Morrisville*. To the contrary, the district court in that case stated: "Plaintiff has not raised any equal protection challenge to Section 15.1(b) as it has been applied here, and we take no position on its constitutionality." 399 F.Supp. at 474 n.4. We now take up the merits of the equal protection challenge posed by the Authority.

## III

■ Well-settled principles of constitutional law require us to apply only "minimal" judicial scrutiny to the classification at issue here. Since Resolution 74–6 neither apportions benefits and burdens on the basis of a "suspect classification" nor impinges on "fundamental interests," it violates equal protection only if it bears no rational relationship to a legitimate state purpose. *United States Railroad Retirement Board v. Fritz*, —— U.S. ——, ——, 101 S.Ct. 453, 459–460, 66 L.Ed.2d 368 (1980); *Massachusetts Board of Retirement v. Murgia*, 427 U.S. 307, 312, 96 S.Ct. 2562, 2566, 49 L.Ed.2d 520 (1976). In *Vance v. Bradley*, 440 U.S. 93, 99 S.Ct. 939, 59 L.Ed.2d 171 (1979), the Supreme Court detailed this standard of review:

> [C]ourts are quite reluctant to overturn governmental action on the ground that it denies equal protection of the laws. The Constitution presumes that, absent some reason to infer antipathy, even improvident decisions will eventually be rectified by the democratic process and that judicial intervention is generally unwarranted no matter how unwisely we may think a political branch has acted. Thus, we will not overturn such a statute unless

the varying treatment of different groups or persons is so unrelated to the achievement of any combination of legitimate purposes that we can only conclude that the legislature's actions were irrational.

*Id.* at 97, 99 S.Ct. at 943 (footnotes omitted).[7] Enactments of Congress and other legislative bodies [8] carry a presumption of constitutionality, and the burden rests on those challenging a classification to show that it is not rationally related to its purpose. *See Mathews v. Lucas*, 427 U.S. 495, 510, 96 S.Ct. 2755, 2764, 49 L.Ed.2d 651 (1976). Yet, while a court should not strike down classifications simply because it deems them unwise or inartfully drawn, *see United States Railroad Retirement Board v. Fritz*, at ——, 101 S.Ct. at 459–460, we are admonished that the rationality standard is not "toothless," *see id.* at ——, 101 S.Ct. at 463–464 (Brennan, J., dissenting); *Mathews v. Lucas*, 427 U.S. at 510, 96 S.Ct. at 2764.

■ When reviewing a classification under the rationality test, then, a court must conduct a two-step analysis. First, it should identify the purposes of the statute and assure itself that these purposes are legitimate; ordinarily, this inquiry will involve examination of statements of purpose and other evidence in the legislative histo-

7. The Court in *Bradley* upheld Section 632 of the Foreign Service Act of 1946, 22 U.S.C. § 1002 (1976), which requires mandatory retirement at age 60 of federal employees covered by the Foreign Service retirement and disability system. The Court found this provision supported by a rational basis, even though no mandatory retirement age is established for Civil Service employees, including those who serve abroad.

The Supreme Court will review certain equal protection challenges under more stringent standards: strict and intermediate scrutiny. The former test—whether the challenged classification is necessary to the accomplishment of a compelling state interest—thus far has been reserved for discriminations based on race, national origin, alienage, and for classifications made on account of the exercise of a constitutional right. The latter standard—whether the discrimination substantially furthers the achievement of an important governmental objective—thus far has been applied only to classifications based on gender or ille-

gitimacy. For a collection of cases, see generally G. Gunther, Constitutional Law ch. 10 (10th ed. 1980).

8. How the constitutional challenge in the present case is conceptualized—whether as directed against the signatory states or the Congress—does not affect the resolution of this appeal. Although the Fourteenth Amendment's guarantee of equal protection applies only to the states, the Supreme Court has held that the Due Process Clause of the Fifth Amendment forbids the federal government from denying equal protection of the laws, *see Vance v. Bradley*, 440 U.S. 93, 94 n.1, 99 S.Ct. 939, 942 n.1, 59 L.Ed.2d 171 (1979); *Bolling v. Sharpe*, 347 U.S. 497, 498–99, 74 S.Ct. 693, 694, 98 L.Ed. 884 (1954). Equal protection analysis is "precisely the same" under both amendments, *Weinberger v. Wiesenfeld*, 420 U.S. 636, 638 n.2, 95 S.Ct. 1225, 1228, 43 L.Ed.2d 514 (1975); *see Buckley v. Valeo*, 424 U.S. 1, 93, 96 S.Ct. 612, 670, 46 L.Ed.2d 659 (1976).

ry.[9]  Second, having identified the governmental purposes, the court must determine whether the classification is rationally related to the achievement of these goals.[10]

Applying these principles to the case at hand,[11] we first look for the purposes underpinning the "grandfather" provision whose implementation, through Resolution 74–6, the Authority challenges.  As noted above, Congress added Section 15.1(b) to the Compact as a precondition to federal participation.  Unfortunately, the legislative history of Congressional ratification of the Compact does not disclose the purposes behind Section 15.1(b).  The Report of the Senate Committee on Public Works notes generally that Congress added amendments to the Compact "in order to provide minimum protection of federal interests."  S.Rep.No.87–985, 87th Cong., 1st Sess. 6 (1961).  But as Judge Newcomer observed in *Borough of Morrisville*, "It is unclear from the legislative history . . . what the federal interest is

in insuring that pre-1961 users be exempt from Commission charges."  399 F.Supp. at 474.[12]

Neither does the background information relating to the Commission's adoption of Resolution 74–6 reveal what purpose the Commissioners believed supported the Compact's exemption provision, or what objectives the Commissioners had in mind in structuring the exemption in the manner the Resolution prescribes.  While the Commission did indicate, in a public notice, its reasons for establishing water use charges, these reasons seem at best unrelated, and perhaps even contrary, to the practice of allowing established users to withdraw water free of charge.  Until 1974, the Commission relied on the general revenues of the member states to meet the financial obligations it incurred.  With Resolution 74–6, the Commission altered its method of defraying the costs of storing water in the Basin's reservoirs:  the states would still

**9.**  *See Malmed v. Thornburgh*, 621 F.2d 565, 572–73 (3d Cir. 1980) (legislative history of statute setting mandatory age for state judges disclosed four legitimate purposes for the provision).  In addition, the court might consider general public knowledge about the evil sought to be remedied, prior law, accompanying legislation, and formal public pronouncements.  *See Developments in the Law—Equal Protection*, 82 Harv.L.Rev. 1065, 1077 (1969); H. Hart & A. Sacks, The Legal Process 1413–16 (Tent. ed. 1958).

**10.**  Some commentators have maintained that the legislature is better equipped than a court to determine whether its purposes are furthered by the legislation it enacts.  They conclude that the rationality standard is not an appropriate basis for judicial review.  *See* Linde, *Due Process of Lawmaking*, 55 Neb.L.Rev. 197 (1976); Posner, *The De Funis Case and The Constitutionality of Preferential Treatment of Racial Minorities*, 1974 Sup.Ct.Rev. 1.  *But see* Michelman, *Politics and Values, or What's Really Wrong with Rationality Review?*, 13 Creighton L.Rev. 487, 503–06 (1979) (criticizing this view).

**11.**  Neither party to this appeal suggests that, because the challenged classification was devised by an administrative rather than legislative body, principles other than those of conventional "bottom tier" equal protection scrutiny should apply.  Moreover, in applying rationality analysis, courts generally do not subject administrative action to more exacting scrutiny

than that accorded legislative decisions.  *See, e. g., New York City Transit Auth. v. Beazer*, 440 U.S. 568, 99 S.Ct. 1365, 59 L.Ed. 587 (1979).  *But cf. Hampton v. Mow Sun Wong*, 426 U.S. 88, 114–16, 96 S.Ct. 1895, 1910–1911, 48 L.Ed.2d 495 (1976) (Civil Service Commission cannot assert objective that is proper responsibility of President or Congress).  The equivalent treatment of legislative and administrative choice has on occasion been questioned, however.  *See* Sandalow, *Judicial Protection of Minorities*, 75 Mich.L.Rev. 1162, 1187 (1977); Bennett, *"Mere" Rationality in Constitutional law: Judicial Review and Democratic Theory*, 67 Calif.L.Rev. 1049, 1049 n.1 (1979).  Generally absent from administrative decisionmaking is the safeguard of correction of unwise policy choices by the democratic process—the safeguard cited by the Supreme Court in *Vance v. Bradley*, 440 U.S. at 97, 99 S.Ct. at 943, as underpinning rational basis analysis.  In addition, while a legislature must be assumed to understand its own objectives and to allocate burdens and benefits in furtherance of them, this assumption becomes more attenuated when the classification in question is drawn by an administrative agency.

**12.**  *See also Delaware River Basin Comm'n v. Bucks County Water & Sewer Auth.*, 474 F.Supp. 1249, 1255 (E.D.Pa.1979) (Pollak, J.) ("The legislative history does not make clear why Congress chose to add Section 15.1(b) to the Compact.")

finance a portion of the costs, but charges levied on individual users of the River's waters would also be used to meet part of the costs. In *Borough of Morrisville*, the district court explained the rationale for water use charges:

> The theory behind the user charges was that the River Basin should be seen as one pool of water [with] each user benefiting from the enlargement of the pool's water supply regardless of whether the water stored in the reservoirs directly benefit the user. In explaining the "pooled water" concept, the Commission stated:
>
> > All users benefit from a regulated pool of water. In this case, the pool is defined as the Delaware River Basin System. As water seeks its level over its entire surface, benefits tend to diffuse to users of water resources throughout the entire pool service area. So long as a reservoir, regardless of its location, contributes to the entire pool, at a justified cost, and so long as users are dependent upon the pool for their supply, benefits accrue to users at least to the extent of their alternative cost of providing the service they enjoy from the pool. Notice to Interested Parties, Water Supply Pricing Hearing Issues, Part II, pp. 4–7.
>
> According to this concept, the upriver user pays towards a downriver reservoir in lieu of replacing the water which it takes from the River.

399 F.Supp. at 471.

The "pooled water" concept underlying the Commission's system of water use charges does not explain the exemption for pre-1961 users. If anything, the Commission's statement suggests that such exemptions are inconsistent with the "pooled water" theory. Since all users benefit from a regulated pool of water, it is difficult to perceive what legitimate purpose is served by charging only some users for the use of that regulated pool.

In short, neither the Congress, when it added Section 15.1(b), nor the Commission, when it adopted Resolution 74–6, identified a legitimate goal that is furthered by exempting certain users of Basin waters from the charges shouldered by others. Consequently, if the challenged "grandfather" exemption is to survive rationality review, we must look elsewhere to find the governmental purposes which it helps secure.

## IV

Traditionally, in the absence of an articulated purpose in the legislation or in its history, courts have upheld challenged provisions that furthered the attainment of goals either suggested by the parties or postulated by the reviewing court itself. Before examining whether Section 15.1(b) and Resolution 74–6 advance purposes that might be hypothesized in these ways, we must consider the propriety in this case of such speculation about legislative ends.

The Supreme Court has on occasion expressed a willingness to sustain a classification that serves some conceivable purpose, even though the Court has no assurance that the purpose entered the mind of even a single legislator. Perhaps the clearest expression of this viewpoint came from Justice Harlan in *Flemming v. Nestor*, 363 U.S. 603, 80 S.Ct. 1367, 4 L.Ed.2d 1435 (1960). In concluding that the denial of social security benefits to certain types of deportees was rational because the benefits would not have added to the "overall national purchasing power," Justice Harlan wrote that it was "constitutionally irrelevant whether this reasoning in fact underlay the legislative decision." *Id.* at 612, 80 S.Ct. at 1373. On this theory, a court may discern a valid purpose even in the face of legislative silence, with the court's imagination supplying the only bounds to the range of purposes that might be attributed.

During the twenty years since *Flemming*, however, the Supreme Court has sometimes indicated that rationality analysis must consider the *actual* purposes of the legislature, rather than post hoc justifications offered by government attorneys or hypothesized by the court itself. For instance, in *Weinberger v. Wiesenfeld*, 420 U.S. 636, 648 n.16, 95 S.Ct. 1225, 1233 n.16, 43 L.Ed.2d 514

(1975), the Court, through Justice Brennan said:

> This Court need not in equal protection cases accept at face value assertions of legislative purposes, when an examination of the legislative scheme and its history demonstrated that the asserted purpose could not have been a goal of the legislation.[13]

And in *McGinnis v. Royster*, 410 U.S. 263, 270, 93 S.Ct. 1055, 1059–1060, 35 L.Ed.2d 282 (1973), the Supreme Court indicated that a challenged classification will survive rationality analysis when it "rationally furthers some legitimate, *articulated* state purpose." *See also id.* at 276, 93 S.Ct. at 1062 (purpose upholding a statutory class must be "legitimate and nonillusory"); *San Antonio School District v. Rodriguez*, 411 U.S. 1, 17, 93 S.Ct. 1278, 1288, 36 L.Ed.2d 16 (1973) (classification must further a "legitimate, articulated purpose").

Significantly, the Supreme Court, while testing the constitutionality of a "grandfather" provision, has emphasized the importance of articulating the legislative purpose. In *United States v. Maryland Savings-Share Insurance Corp. (MSSIC)*, 400 U.S. 4, 91 S.Ct. 16, 27 L.Ed.2d 4 (1970) (per curiam), the Court upheld a section of the Internal Revenue Code that exempted from taxation any nonprofit corporation that insured savings institutions, provided the corporation existed as of September 1, 1957. The Court observed that "the legislative history of [the challenged provision] *affirmatively discloses* that Congress had a rational basis for declining to broaden the exemption by extending the cutoff date" (emphasis supplied).[14] Moreover, the Court distinguished *Mayflower Farms, Inc. v. Ten Eyck*, 297 U.S. 266, 56 S.Ct. 457, 80 L.Ed. 675 (1936)—a Depression-era case that struck down a state price support system that had favored only dealers who had entered the market before a certain date—by noting that "according to the Court in [*Maryland Farms*], the legislative record contained no affirmative showing of a valid legislative purpose." 400 U.S. at 7 n.2, 91 S.Ct. at 18 n.2.[15]

The opinion in *MSSIC*, then, appears to suggest the possibility that a "grandfather" provision will not survive equal protection scrutiny unless the legislative history reveals some specified purpose for its inclusion in the statute. Such a rule might be rationalized on the ground that "grandfather" clauses possess especially strong potential for abuse of the political process. By definition, a "grandfather" clause confers an economic advantage on those engaged in a given activity at a specified date as against all those who participate in the activity for the first time after the date. At least on its face, favoritism of this sort

---

**13.** Although *Wiesenfeld* exemplifies the "middle tier" of equal protection scrutiny, *see The Supreme Court, 1974 Term*, 89 Harv.L.Rev. 47, 95–100 (1975), the Court's reluctance to rationalize a classification on the basis of purposes that cannot reasonably be attributed to the legislature has surfaced as well in cases involving "bottom tier" equal protection analysis. *See Eisenstadt v. Baird*, 405 U.S. 438, 447–52, 92 S.Ct. 1029, 1035–1038, 31 L.Ed.2d 349 (1972).

**14.** Testimony before the Senate Finance Committee on a proposal to extend the cutoff date to January 1, 1963 had indicated that continued forward movement of the date might lead to a proliferation of state insurers, and that this could hinder the operations and threaten the financial stability of the Federal Savings and Loan Insurance Corporation.

**15.** By declining to overrule *Mayflower Farms*, we believe that the Supreme Court in *MSSIC* at least intimated that a grandfather provision

such as we have here conceivably might fail the rational basis test. We therefore cannot agree with the dissent's suggestion that equal protection scrutiny of purely economic regulation was "finally put to rest" by *Ferguson v. Skrupa*, 372 U.S. 726, 83 S.Ct. 1028, 10 L.Ed.2d 93 (1963). *Skrupa*, it is important to note, turned primarily on the Court's rejection of due process analysis to strike down economic regulations, and, in any event, was decided seven years before *MSSIC*. While we doubt that *Skrupa* disposes of the equal protection issue present in the case before us, we acknowledge that almost all economic and social regulation will survive rational basis scrutiny. We do not intend with today's decision to invite the judiciary to substitute its judgment on economic and social questions for that of the legislature. Instead, our only concern is whether there is a reasonable basis to support the specific regulation challenged here.

might often appear the product of a political arrangement "that does no more than favor one interest at the expense of another,"[16] rather than the result of a reasoned judgment about a socially beneficial policy.[17] Such a danger is especially great when, as in the present case, the regulation of which the "grandfather" provision is a part is enacted not for the benefit of the general public, but for the benefit of the same group that is regulated.[18] Requiring the legislature to make known its reasons for adopting a "grandfather" clause would provide the reviewing court with some assurance that the provision does not represent political exploitation of one group at the expense of another.[19]

■ Notwithstanding these considerations, we are reluctant to hold that the "grandfather" provision challenged here can survive equal protection scrutiny only if shown to further some legitimate goal actually set forth in the legislative history. In a recent statement on the rational basis standard, a majority of the Supreme Court emphasized that, at least when social and economic legislation is at issue, courts generally should defer to legislative classifications.

16. Bennett, *supra* note 11, at 1083.

17. For an examination of the capacity of rationality review to screen out legislative acts that are exploitive, see Michelman, *supra* note 10, at 498–511.

18. Most regulation that typically is "grandfathered in" is aimed at protecting the general public. For example, a requirement stipulating that, in order to be admitted to the bar, a lawyer must have graduated from an accredited law school, but exempting current members of the bar, is aimed at protecting the public from incompetent legal assistance. The exemption for current practitioners reflects a judgment that these individuals have already demonstrated their competence, and that they have substantial reliance interests in obtaining their livelihood through the practice of law. By contrast, the levying of water charges by the Commission is aimed at securing a benefit not for the public at large but for the very group that is regulated—users of Basin water. This congruence between the class of persons regulated and the class of beneficiaries makes the favoring of some regulatees through adoption of a "grandfather" provision particularly questionable. It was largely because of a similar congruence that the Supreme Court struck

*United States Railroad Retirement Board v. Fritz,* —— U.S. ——, 101 S.Ct. 453, 66 L.Ed.2d 368 (1980). Although the Court did not address the question whether a reviewing court should examine the relation of a classification to purposes supplied by the court's own speculation, in *Jefferson v. Hackney,* 406 U.S. 535, 549, 92 S.Ct. 1724, 1733, 32 L.Ed.2d 285 (1972), one of two cases cited approvingly in *Fritz* as exemplifying the proper approach to rationality scrutiny,[20] the Court appeared to engage in such hypothesizing. While the Court in *Fritz* did not have occasion to consider whether a somewhat less deferential attitude might be appropriate when a "grandfather" provision is challenged, the regulation before us would appear to fit within the category of "social and economic" regulation of which the Court spoke. Moreover, to cabin the judicial imagination by imposing a stated-purpose requirement would, as Professor Fiss points out, seem inconsistent with judicial practice in other areas, such as determining whether legislation is authorized by the enumerated powers. Fiss, *Groups and The Equal Protection Clause,* in Equality and Preferential Treatment 84, 90 (M.

down the "grandfather" clause challenged in *Mayflower Farms, Inc. v. Ten Eyck,* 297 U.S. 266, 56 S.Ct. 457, 80 L.Ed. 675 (1936). There New York established minimum prices for the sale of milk, but gave special pricing privileges for certain dealers who had been in the business as of April 1933. The Supreme Court found it significant that the group whose prices were regulated was also the group the legislature hoped to assist through regulation, and concluded that under these circumstances a discrimination in treatment based on when a dealer entered the business must be regarded as arbitrary. *Id.* at 274, 56 S.Ct. at 459.

19. We note that, in the present case, it might be argued that the interests of politically powerful users have overborne those of more modest users. The exemptions of Resolution 74–6 would appear to work to the advantage of some of the largest consumers of Basin water—for example, the City of Philadelphia.

20. —— U.S. at ——, n. 10, 101 S.Ct. at 470, n. 10. The other case cited was *Dandridge v. Williams,* 397 U.S. 471, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970).

Cohen, T. Nagel & T. Scanlon eds. 1977). For these reasons, we decline to hold that Section 15.1(b) and Resolution 74–6 are invalid because neither Congress nor the Commission has stated the purpose behind a "grandfather" exemption for water use charges. So long as we are careful not to attribute to the legislature purposes which it cannot reasonably be understood to have entertained,[21] we find that in examining the challenged provisions we may consider purposes advanced by counsel for the Commission or suggested initially by ourselves.

### V

In upholding Resolution 74–6 on equal protection grounds, the district court evidently concluded that it was free to speculate on the possible objectives underlying these provisions. After noting that "the legislative history does not make clear why Congress chose to add Section 15.1(b) to the Compact," the Court added:

> But it seems entirely expectable for Congress to have elected to distinguish between uses of Basin waters legally sanctioned as of 1961 and uses which would arise and seek legal sanction in the future. Congress may well have supposed that, broadly speaking, the Delaware River and its tributaries met the water use needs of the region as of 1961, and that most Commission projects aimed at enlarged and more equitable water allocation would be geared to meeting needs developing after the effective date of the Compact.

474 F.Supp. at 1255. The district court, then, postulated that the "grandfather" provisions sought to shield established users from costs incurred by the Commission in meeting the needs of post–1961 users.

While this might, in theory, be an appropriate goal, we doubt whether this purpose explains the challenged regulation. As noted above, the Commission itself recognizes that all users, both established and new, benefit from a regulated pool of water, and specifically, that all users benefit from storing water in reservoirs, whether or not a particular user draws from the stored water. If we accept the Commission's own rationale for imposing charges for use of Basin water, it would appear that all users benefit from the projects whose costs the charges are meant to defray, and that exemptions from charges cannot be justified as intended to apportion charges in relation to benefit.

■ Even assuming, however, that the water use charges are designed, at least primarily, to distribute the costs of Commission projects among those users whose demands for Basin water arose after 1961, we fail to perceive how Resolution 74–6 bears a rational relation to that goal. For the Resolution does not make the measure of exemption the actual usage as of the effective date of the Compact, but relies on other criteria, such as state-issued permits, pumping capacity, and allocable flow. A user who withdrew Basin water before 1961 might thereafter have increased the amount of water drawn from the Basin's resources, thereby contributing to the increasing demands for Basin water, yet have remained exempt from water use charges so long as the increased diversions did not exceed the user's "legal entitlement" as defined in Resolution 74–6. The City of Philadelphia, an original party to the present suit, provides a case in point. Although Philadelphia has a "legal entitlement" to 423,000,000 gallons of Basin water

---

**21.** Justice Brennan has pointed out the dangers of attributing to a legislature purposes it did not in fact entertain: "If a legislature, considering the competing factors, determines that it is wise policy to treat two groups of people differently in pursuit of a certain goal, courts often defer to that legislative determination. But when a legislature has decided *not* to pursue a certain goal, upholding a statute on the basis of that goal is not properly deference to a legislative decision at all; it is deference to a decision which the legislature could have made but did not." *Schlesinger v. Ballard,* 419 U.S. 498, 520 n.11, 95 S.Ct. 572, 576 n.11, 42 L.Ed.2d 610 (1975) (Brennan, J., dissenting). *See also* Gunther, *The Supreme Court 1971 Term—Forward: In Search of Evolving Doctrine on Changing Court: A Model for a Newer Equal Protection,* 86 Harv.L.Rev. 1, 43–46 (1972). ·

per day,[22] the City's actual usage has never approached this amount. Nonetheless, under the rate scheme of Resolution 74–6, Philadelphia could increase its usage well beyond its current level and remain within its exemption—even though its increased withdrawal would be among the uses which have come into existence after 1961 and which have required the Commission to undertake conservation projects. If Section 15.1(b) reflects a policy that users of Basin water who place demands on Basin resources exceeding those made in 1961 should pay for Commission projects undertaken to satisfy those demands, then Resolution 74–6, by forcing some users to pay those costs while exempting others, appears to be an arbitrary, rather than a rational, implementation of that policy.[23]

While the rate scheme of Resolution 74–6 might conceivably be constitutionally permissible if the favored treatment for established users were merely temporary, one striking characteristic of the exemption as granted is its permanency. One theme of equal protection law is that a legislature may undertake reforms one step at a time, and that a reviewing court ordinarily should not overrule a legislative decision simply because the challenged provision adopts a gradual approach to solving a problem.[24] This principle has been cited in cases involving challenges to "grandfather" provisions. In *New Orleans v. Dukes*, 427 U.S. 297, 96 S.Ct. 2513, 49 L.Ed.2d 511 (1976) (per curiam), the Supreme Court upheld a New Orleans ordinance that prohibited pushcart vendors from selling food in the French Quarter, but excepted those vendors who had operated in the Quarter for eight years or more. The Court observed that "[l]egislatures may implement their program step by step ... adopting regulations that only partially ameliorate a perceived evil and deferring complete elimination of the evil to future regulations." *Id.* at 303 (citations omitted). Noting that the older vendors had "built up substantial reliance interests in continued operation" in the French Quarter, the Court concluded: "Rather than proceeding by the immediate and absolute abolition of all pushcart food vendors, the city could rationally choose initially to eliminate vendors of more recent vintage." *Id.* at 305, 96 S.Ct. at 2517–2518.

Judicial toleration of step-by-step legislative action, however, does not save the provisions challenged in the present case. The Supreme Court in *Dukes* could sanction a gradual approach since the challenged exemption would eventually expire; in time, all of the vendors allowed to continue work in the French Quarter would retire, and the ban on vendors would become absolute. In our case, however, Resolution 74–6 grants a *permanent* exemption for pre-1961 users to the extent of their "legal entitlement." Nothing in the record suggests that the Commission some day will alter this exemption. It would involve sheer speculation on our part to regard the Resolution as the first step toward eventual requirement of

---

**22.** The Commission has asserted, in a separate proceeding, that Philadelphia's "entitlement" under Resolution 74–6 is not 423,000,000 gallons per day, as specified in a permit issued by the Pennsylvania Department of Forests and Waters in 1955, but a lower quantity reflecting the City's pumping capacity as of 1961. This lesser quantity is nonetheless higher than Philadelphia's actual aggregate draw from the Delaware in 1961 or any time since. *See Delaware River Basin Comm'n v. Bucks County Water & Sewer Auth.*, 474 F.Supp. 1249, 1253 n.8 (E.D. Pa.1979). This administrative proceeding has no bearing on the present appeal.

**23.** A slightly different perspective helps illuminate the problem we see with Resolution 74–6. If Philadelphia were to stop selling water to Bucks County, and instead were to divert the water it currently sells to uses arising within the City, then under Resolution 74–6 no charges would be levied, even though the amount of water withdrawn by Philadelphia would be precisely the same as under the arrangement now in effect. We fail to perceive how a rate structure that tolerates this result is rationally conducive to the goal of fair allocation of the costs of Commission projects, or to the Commission's more general goals of conservation and equitable management of the Basin's water resources.

**24.** *See, e. g., Katzenbach v. Morgan*, 384 U.S. 641, 657, 86 S.Ct. 1717, 1727, 16 L.Ed.2d 828 (1966); *Williamson v. Lee Optical Co.*, 348 U.S. 483, 488–89, 75 S.Ct. 461, 464–469, 99 L.Ed. 563 (1955).

contributions from all users who exceed their 1961 demand for Basin water, rather than as a grant of permanent immunity for some.

Moreover, the "reliance interests" cited in *Dukes* do not apply to the exemption from water use charges as codified in Resolution 74–6. While a user arguably has a reliance interest in continuing to withdraw, free of charge, the amount of Basin water diverted before the Compact became effective, we perceive no reliance interest in free enjoyment of an amount exceeding actual usage.

For these reasons we disagree with the district court's conclusion that Resolution 74–6 can be rationalized as an attempt to distribute the costs of regulation among users whose recent demands have made regulation necessary. The apparently permanent exemption granted those users who withdraw more water than they did in 1961, but less than their 1961 "legal entitlement," persuades us, at least at this time, that Resolution 74–6 is not a rational means to this end.

## VI

In addition to the reviewing court's own speculations, a justifying rationale for a classification might originate with the agency charged with administering the challenged provision.[25] At oral argument, counsel for the Commission suggested as the purpose for the exemptions of Section 15.1(b) and Resolution 74–6 the preservation of those rights to water that existed as of the effective date of the Compact. As recognized in Resolution 74–6, by 1961 some users had obtained permits, authorized by state law, to withdraw or divert Basin water. In adding Section 15.1(b) to the Compact, Congress may have been expressing its wish to protect political entities that had already received rights to Basin water, so that they would not be worse off under

the Compact than before. While the district court understood the water use exemption as an attempt to allocate regulation costs fairly, this proposal regards the exemption as directed toward conserving rights granted before the Compact.

■ We find this suggestion unsatisfactory. The terms of the Compact make clear that the broad regulatory powers granted the Commission include the authority to override whatever allocation systems had earlier been devised by signatory states. Section 10.1 of the Compact states: "The Commission may regulate and control withdrawals and diversions from surface waters . . . of the Basin." And Section 10.8 provides: "Whenever the Commission finds it necessary or desirable to exercise the powers conferred on it by this article, any diversion or withdrawal permits authorized or issued under the laws of any of the signatory states shall be superseded to the extent of any conflict with the control and regulation issued by the Commission." Read together, these Sections reveal that, notwithstanding recognition at state law, a user's pre-1961 rights to the enjoyment of Basin water may have to yield to the regulatory enactments of the Commission. These Sections belie any suggestion that solicitude for the state law allocation systems superseded by the Compact was an unarticulated motive of the Congressional amendments.

A more fundamental objection might be leveled against the suggested purpose for Section 15.1(b). Various commentators have observed that it is always possible to hypothesize that the purpose underlying a classification is the goal of treating one class differently from another. A statute's classifications will invariably be rationally related to a purpose so defined, since the "purpose" is, in effect, a restatement of the classification.[26] To engage in such hypothe-

---

**25.** *See* Gunther, *supra* note 19, at 47 (a judicially cognizable purpose need not be set forth in statutory preamble or legislative history; description of purpose from official charged with enforcement should suffice).

**26.** *See* Bennett, *supra* note 11, at 1059; Fiss, *Groups and the Equal Protection Clause,* in Equality and Preferential Treatment 84, 107 (M. Cohen, T. Nagel & T. Scanlon eds. 1977); Note, *Legislative Purpose, Rationality and Equal Protection,* 82 Yale L.J. 123, 128 (1972). Professor Fiss offers the following illustration: "[L]et us

sizing however, would be to render the rational basis standard no standard at all. As Justice Stevens noted while concurring in *United States Railroad Retirement Board v. Fritz,* —— U.S. ——, ——, 101 S.Ct. 453, 461–462, 66 L.Ed.2d 368 (1980): "If the analysis of legislative purpose requires only a reading of the statutory language in a disputed provision, and if any 'conceivable basis' for a discriminatory classification will repel a constitutional attack on the statute, judicial review will constitute a mere tautological recognition of the fact that Congress did what it intended to do."

The suggestion that Congress intended, in adding Section 15.1(b), to preserve without interference or burden those state-created rights in existence on the effective date of the Compact comes dangerously close to the type of tautological explanation against which Justice Stevens has warned. While Section 15.1(b) as implemented by Resolution 74–6 has the effect of dividing users into two classes—those who had "legal entitlements" as of 1961 and those who had not—this Court should be wary of confusing the classification itself with a legitimate state purpose underlying it.

## VII

█ Thus far, we have been unable to conceive of any rationale for the exemption of Resolution 74–6, other than those already considered. Inasmuch as it has not been demonstrated that the exemption from water use charges conferred on certain users of Basin water by Resolution 74–6 is rationally related to the attainment of a legitimate state purpose, we cannot sustain—at least at this time—the Resolution against the constitutional challenge mounted by the Authority. The only remaining

question is whether remand to the district court would serve a useful function. At oral argument, counsel for the Commission argued against remand, maintaining that no further evidence of the purposes underlying Section 15.1(b) could now, almost twenty years after adoption of the Compact, be advanced. Notwithstanding the Commission's candid acknowledgement of these difficulties, we believe it more prudent to remand the present controversy than to grant final disposition by this Court. The difficulties attending any effort to divine legislative intent no doubt are greatly magnified when the legislature acted two decades past and left no clear trace of its designs. But as we earlier concluded, it is doubtful whether the actual purpose of the Congress need be established. So long as the Commission can proffer some purpose that the court may reasonably presume to have motivated the Congress that added Section 15.1(b) to the Compact, there will be available a standard against which to test the rationality of Resolution 74–6. We believe the Commission should have an opportunity to attempt this type of explanation.

In addition, remand may prompt pre-1961 users to intervene in the lawsuit. Modification of the Resolution 74–6 exemption would adversely affect users, such as the City of Philadelphia, who currently enjoy immunity from water use charges. We believe it would be helpful, before a final decision on the constitutionality of the Resolution is made, if representatives of these parties were provided an opportunity to appear before the court to advance their arguments for maintaining the current system of exemptions.[27]

Accordingly, the judgment of the district court will be vacated and the case remanded.

assume that the policy at issue is one preferring blacks for admission to law school. The first impulse is to identify the purpose as one of increasing the number of black lawyers.... But what appears at first to be a purpose seems to be nothing more than a restatement of the practice. Why does the state want to increase the number of black lawyers? The answer to this question yields what may more properly be deemed a purpose." Fiss, *supra*, at 107.

**27.** The posture of the Authority also counsels in favor of remand rather than reversal. Although the Authority moved for summary judgment before the district court and appealed from the court's denial of its motion, in both the Authority's brief and oral argument before this Court it has requested no more drastic remedy than remand.

BROTMAN, District Judge, dissenting:

The majority opinion is both thoughtful and scholarly. In my judgment, however, the majority ultimately arrives at an incorrect result. Therefore, I must respectfully dissent.

Initially, it is worthwhile to note that I concur with the majority in the applicability of the rational basis standard of scrutiny. The reasons underlying this deserve brief mention. First, we are concerned here with a purely economic regulation, one that has no effect on any fundamental rights. The sole question before us is who must pay the Commission for water withdrawn from the Delaware.[1] Secondly, there can be no contention that the statutory scheme at issue here invidiously discriminates against any suspect class. Surely, the predominantly suburban residents of Bucks County have access to the political process to effect any needed reforms. Cf. United States v. Carolene Prods. Co., 304 U.S. 144, 152 n.4, 58 S.Ct. 778, 783–784 n.4, 82 L.Ed. 1234 (1938); Harzenski & Weckesser, The Case for Strictly Scrutinizing Gender-Based Separate But Equal Classification Schemes, 52 Temp.L.Q. 439, 450–52 (1979). Hence, because a purely economic regulation is at issue and because no suspect class is implicated, the proper standard of scrutiny is that of the rational basis test.[2]

The rational basis test demands that a statutory or regulatory classification be rationally related to a legitimate governmental end. Vance v. Bradley, 440 U.S. 93, 97, 99 S.Ct. 939, 943, 59 L.Ed.2d 171 (1979). It does not demand that the legislature adopt the best possible or fairest allocation of rights and duties, but merely insists that the legislature act reasonably. As it seems very clear to me that the classification at issue here is a rational one, I would affirm the judgment below. In establishing the Commission and giving it the right to levy charges for withdrawals from the river, Congress decided to respect the existing legal rights of various local entities to withdraw water free of charge. The grandfather clause at issue here was enacted to prevent the Commission from charging municipalities such as Philadelphia and New York for continuing to withdraw water in the quantities they were legally sanctioned to withdraw before the Commission was established. The rationale for this provision is amply explicated in the opinion below:

But it seems entirely expectable for Congress to have elected to distinguish between uses of Basin waters legally sanctioned as of 1961 and uses which would arise and seek legal sanction in the future. Congress may well have supposed that, broadly speaking, the Delaware River and its tributaries met the water use needs of the region as of 1961, and that most Commission projects aimed at enlarged and more equitable water allocation would be geared to meeting needs developing after the effective date of the Compact. A "grandfather clause" exempting from charges those uses previously validated by state law is a reasonable legislative classification wholly consistent with the principles of equal protection.

Delaware Riv. Basin Comm'n v. Bucks Cty. Water & Sewer Auth., 474 F.Supp. 1249,

---

1. Of course, even if the important issue of access to water were involved here, which it is not, we would nonetheless employ minimal scrutiny. Access to water is not the kind of fundamental constitutional right that merits equal protection strict scrutiny. See generally San Antonio Ind. School Dist. v. Rodriguez, 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973); Gunther, The Supreme Court 1971 Term— Foreword: In Search of Evolving Doctrine on a Changing Court: A Model for a Newer Equal Protection, 86 Harv.L.Rev. 1 (1972).

2. In footnote 11 the majority advances the intriguing idea that administrative agency regulations may deserve more careful scrutiny than statutes adopted by elected legislatures. That idea may have merit in general, but it is inapplicable here. If one compares Commission Resolution 74–6 with Section 15.1(b) of the Compact, it is evident that the resolution directly implements the statutory "grandfather clause." Indeed, the resolution represents a rather grudging interpretation of the statutory exemption. Thus, to the extent we invalidate the resolution, we also, in effect, invalidate the statute.

1255 (E.D.Pa.1979) (footnote deleted). In brief, at the time the Commission was established, the natural flow of the river was evidently sufficient to meet the needs of the existing users in the amounts they were legally sanctioned to withdraw. Because whatever improvements were later made by the Commission did not benefit these established users, the grandfather clause—exempting these users from charges for withdrawals not in excess of their legal entitlement as of 1961—was perfectly rational.[3] *Minnesota v. Clover Leaf Creamery Co.,* —— U.S. ——, ——, 101 S.Ct. 715, 725–726, 66 L.Ed.2d 659 (1981).

I do not mean to argue that the system adopted is the best or most equitable of all conceivable ways to finance the improvements for the Delaware. Indeed, in my opinion, it would be proper for Philadelphia, a major user of the river's water, to share the cost of any necessary improvements. However, these are concerns properly addressed to the legislature, not to this Court in its role as guardian of the Constitution. I had thought that equal protection scrutiny of purely economic regulations was finally put to rest some years ago in *Ferguson v. Skrupa,* 372 U.S. 726, 83 S.Ct. 1028, 10 L.Ed.2d 93 (1963). *See also Minnesota v. Clover Leaf Creamery Co.,* —— U.S. ——, ——, 101 S.Ct. 715, 725–726, 66 L.Ed.2d 659 (1981); *New Orleans v. Dukes,* 427 U.S. 297, 96 S.Ct. 2513, 49 L.Ed.2d 511 (1976) (per curiam). We must be careful not to open the door towards a return to the era in which courts were all too willing to allow their economic opinions to color their judgments about matters of constitutional law. *See, e. g., Hammer v. Dagenhart,* 247 U.S. 251, 38 S.Ct. 529, 62 L.Ed. 1101 (1918), *overruled, United States v. Darby,* 312 U.S. 100, 61 S.Ct. 451, 85 L.Ed. 609 (1941).

Interestingly, the majority stops short of entirely invalidating the grandfather scheme. The holding appears to be that the statute is constitutional insofar as it allows prior users, such as Philadelphia, to continue withdrawing water free of charge up to the amount of water they were actually withdrawing in 1961, when the Compact became effective. The majority merely finds the statute unconstitutional in that it exempts prior users from charges to a slightly greater extent—in an amount that is the lesser of (a) the quantity authorized by a valid State permit issued prior to 1961, (b) the physical capacity of the user's system to withdraw water at that time, or (c) the total allocable flow at the point of withdrawal. The record does not reveal the precise figures. What is clear, however, is that today's decision merely invalidates the grandfather clause to a relatively slight degree.[4] To my mind, the constitutional guarantee of equal protection does not draw such nice distinctions. That is particularly true with respect to purely economic regulations, such as that present here. The question of the precise scope of the exemption from charges is a matter properly committed to the judgment of the legislature. Accordingly, I would affirm the judgment below.

---

**3.** I agree with the majority that it would have been preferable had Congress expressly articulated the purpose(s) of the grandfather clause. However, legislators are very busy people. Thus, it is impractical to insist that Congress provide a justification for every subsection of every statute it passes.

**4.** The assertion that Philadelphia and other pre-1961 users have no "reliance interest" in amounts in excess of their actual usage in 1961 is subject to dispute. The Commission's regulation would only allow free withdrawals to the extent of the user's pumping capacity in 1961. Obviously, in building their pumping facilities, pre-1961 users legitimately relied on their free access to the Delaware's water to the extent authorized by existing law.