**DELAWARE RIVER BASIN COMMISSION, et al.**

v.

**BUCKS COUNTY WATER & SEWER AUTHORITY, et al.**

**Civ. A. No. 77–2688.**

United States District Court, E. D. Pennsylvania.

June 30, 1982.

David J. Goldberg, Princeton, N. J., for plaintiffs.

Victor S. Jaczun, Perkasie, Pa., for defendant, Bucks Co. Water & Sewer Authority.

Frank M. Thomas, Jr., Deputy City Sol., Philadelphia, Pa., for defendant City of Philadelphia.

## OPINION

LOUIS H. POLLAK, District Judge.

This matter is here on remand from the Court of Appeals.[1] It presents questions as to the authority of the Delaware River Basin Commission ("DRBC")—a river-regulatory body established in 1961 by interstate compact and composed of Delaware, New Jersey, New York, Pennsylvania and the United States—to impose charges for withdrawals of water from the Delaware River. What this court must do is determine whether the scheme of water-use charges and exemptions established by DRBC eight years ago in its Resolution 74–6 satisfies the principles of equal protection enshrined in the Fourteenth Amendment and incorporated in the Fifth Amendment.

This action began as a suit by DRBC to impose water-use charges on defendants Bucks County Water and Sewer Authority ("Bucks County") and the City of Philadelphia for water drawn from the Delaware by Philadelphia and subsequently sold to Bucks County. In granting DRBC's motion for summary judgment, I determined (a) that while Philadelphia was exempt from water-use charges for withdrawals made for its own use, this exemption did not extend to withdrawals made for sale to non-exempt third parties such as Bucks County, and (b) that Resolution 74–6, imposing charges on water-users generally but exempting Philadelphia and other users having a "legal entitlement" to take water from the Delaware before the 1961 Delaware River Basin Compact, did not violate the constitutional guarantee of equal protection. Accordingly, the defendants were found liable for water-use charges imposed by DRBC pursuant to Resolution 74–6 for the water withdrawn by Philadelphia and sold to Bucks County.[2] *See DRBC v. Bucks County Water and Sewer Authority*, 474 F.Supp. 1249 (E.D.Pa.1979).

Bucks County appealed from my determination that Resolution 74–6 was not constitutionally infirm. Without ruling conclusively on the constitutional question, the Court of Appeals vacated the grant of summary judgment and remanded the case to permit DRBC to proffer some rationale for the challenged Resolution that might satisfy the demands of equal protection. I thereupon directed DRBC to notify potential intervenors of the pendency of this action in order to have the benefit of their views. A host of current users of water from the Delaware River Basin have entered this case on both sides of the issue. These intervenors, along with the original parties, have worked with commendable diligence to document the legislative history of the Delaware River Basin Compact which established DRBC and set forth its powers, and to provide a fuller explanation of the purposes and operation of Resolution 74–6. The parties have now cross-moved for summary judgment.

## I. *Questions Presented on Remand*

As the opinion of the Court of Appeals makes clear, the question presented in this case is a narrow one. Under Section 3.7 of the Compact, DRBC has a limited authority to impose water-use charges on those who draw water from the Basin.[3] A principal limitation on this authority is found in Section 15.1(b):

No provision of section 3.7 of the Compact shall be deemed to authorize the commission to impose any charge for water withdrawals or diversions from the Basin if such withdrawals or diversions could lawfully have been made without charge on the effective date of the Compact.

The commission may from time to time after public notice and hearing fix, alter and revise rates, rentals, charges and tolls and classifications thereof, for the use of facilities which it may own or operate and for products and services rendered thereby, without regulation or control by any department, office or agency of any signatory party.

---

**1.** The opinion of the Court of Appeals is found at *DRBC v. Bucks County Water & Sewer Authority*, 641 F.2d 1087 (3rd Cir. 1981).

**2.** It was stipulated between co-defendants that any liability for water-use charges would be paid by Bucks County.

**3.** Section 3.7 provides:

When DRBC decided in the early 1970's to implement a system of water-use charges pursuant to its Section 3.7 authority, it sought to comply with Section 15.1(b) by exempting from such charges those users who withdraw water "in quantities not exceeding the legal entitlement of the user, determined as of October 27, 1961 [the effective date of the Compact]." Resolution 74–6. The "legal entitlement" concept is defined in the following terms:

"Legal entitlement" means the quantity or volume of water expressed in million gallons per month determined by the lesser of the following conditions:

(i) a valid and subsisting permit, issued under the authority of one of the signatory parties, if such permit was required as of October 27, 1961, or thereafter;

(ii) physical capability as required for such taking; or

(iii) the total allocable flow without augmentation by the Commission, using a seven-day, ten-year, low-flow criterion measured at the point of withdrawal or diversion.

Resolution 74–6, § 5–1.3(b)(1) (May 22, 1974).

The appeal by Bucks County was framed narrowly as an attack on Resolution 74–6's definition of the "legal entitlement" criterion governing exemptions from DRBC water-use charges. Accordingly, the constitutionality of Section 15.1(b) itself was not challenged. Moreover, the power of DRBC to promulgate Resolution 74–6 was not contested since it was clearly determined in *Borough of Morrisville v. Delaware River Basin Comm'n*, 399 F.Supp. 469 (E.D.Pa. 1975), *aff'd per curiam*, 532 F.2d 745 (3rd Cir. 1976), that DRBC had authority under the Compact to adopt the Resolution. Thus, the only question presented to the Court of Appeals was whether DRBC's method of implementing Sections 3.7 and 15.1(b) of the Compact was rationally related to a proper governmental purpose. The Court of Appeals concluded that since "it has not been demonstrated that the exemption from water use charges conferred on certain users of Basin water by Resolution 74–6 is rationally related to the attainment of a legitimate state purpose, we cannot sustain—at least at this time—the Resolution. . . ." *DRBC v. Bucks County, supra,* 641 F.2d at 1100. The remand was designed expressly to provide the Commission and any intervenors with an opportunity to "proffer some purpose that the court may reasonably presume to have motivated the Congress that added Section 15.1(b) to the Compact, [so that] there will be available a standard against which to test the rationality of Resolution 74–6." *Id.*[4]

Therefore, in considering the parties' cross-motions for summary judgment on remand, I must first examine the purposes which the Congress may reasonably have sought to advance in enacting Section 15.-1(b), and then determine whether the classifications found in Resolution 74–6 are rationally related to accomplishing such purposes.

A. *The History of the Compact*:

In order to address these particular questions, it may be helpful to review the legislative and administrative history which led to the adoption of the Delaware River Basin Compact.

The early history of conflicts among various competing users of Delaware River Basin water suggested quite strongly the need for some independent regulatory agency charged with the responsibility of managing efficiently the use of these scarce water resources. Until the establishment of DRBC in 1961, the principal means for resolving these disputes were a series of litigations involving some of the largest water users. In 1931, the Supreme Court first addressed such a conflict, holding that New York City would be permitted, over New Jersey's objection, to divert a specified

---

4. The Court of Appeals noted that on remand this court could look to statements of purpose in the Compact, the Compact's legislative history, general public knowledge concerning the problems sought to be resolved by the Compact, prior law, and formal public pronouncements. *See* 641 F.2d at 1092–93 & n.9.

amount of water from the Basin. *See New Jersey v. New York*, 283 U.S. 336, 51 S.Ct. 478, 75 L.Ed. 1104 (1931). The conflict erupted again twenty years later and was ultimately resolved by a consent decree entered into by New Jersey and New York City and approved by the Court. *New Jersey v. New York*, 347 U.S. 995, 74 S.Ct. 842, 98 L.Ed. 1127 (1954). The 1954 consent decree permitted New York City and New Jersey to withdraw water without charge in amounts established by a new formula.

This method of resolving disputes was perceived by the various affected groups to be unsatisfactory and in 1955 the Delaware River Basin Advisory Committee—the precursor of DRBC—was established by the Governors of New York, New Jersey, Delaware and Pennsylvania and the Mayors of New York City and Philadelphia. Its principal mission was to explore alternative ways to allocate and manage the water resources of the Basin and to develop an overall plan to guide its development. *See* Delaware River Basin Research, Inc., *Prospectus* 6–9 (April 16, 1957). The Advisory Committee commissioned a study by the Graduate School of Public Administration of Syracuse University. Building on reports by the Army Corps of Engineers and the work of the Interstate Commission on the Delaware River Basin (INCODEL), the 1959 "Syracuse Report" outlined the initial blueprint for a compact and a regulatory commission and also sketched the basic agenda for the Advisory Committee. *See* Water Research Foundation, *A Brief Report on the Study of Governmental Organization for the Water Resources of the Delaware River Basin by the Maxwell Graduate School, Syracuse University*, 10–28 (1959).

By early 1960 a draft compact was circulated by the Advisory Committee. Following a series of meetings with various state groups, the Advisory Committee developed several revised drafts. At a summit meeting of Governors and Mayors, a Final Draft Compact was approved and these leaders agreed to submit the Final Draft to the four state legislatures and Congress for approval. *See* W. B. Whitall's Notes on Executive Session of Summit Meeting of February 1, 1961 (Feb. 7, 1961). In early 1961, the four states considered and approved the Final Draft.

Apparently, the scope of DRBC's power to levy water withdrawal charges on existing users received little or no attention from the legislatures of the first three states to approve the Final Draft—New York, New Jersey, and Delaware. However, the issue was discussed extensively when the Final Draft was considered by the Pennsylvania legislature. Much of this discussion was prompted by representatives of various industry groups which opposed the imposition of water-use fees for withdrawals that had been made without charge prior to the Compact. Thus, on May 2, 1961, Governor David Lawrence, addressing representatives of several steel and oil companies, noted that while he opposed any amendment of the Final Draft, he felt that the legislature's intention not to impose water-withdrawal charges on existing uses could be clarified by a committee report or other legislative history. In Governor Lawrence's view, this step would provide ample protection for industry groups concerned about such charges. *See* Advisory Committee, *Delaware River Compact Status Report No. 6* at 2 (May 18, 1961). The Pennsylvania Senate's Committee on Forests and Waters also conducted hearings on this issue. In a report issued May 23, 1961, the Committee made clear its understanding that the Compact granted DRBC only a limited rate-making authority:

> As to the charges for water that are permissible under Section 3.7 of the Compact, it is again elementary law that a corporate agency of the signatory parties would have only those powers actually delegated to it. Nowhere in the Compact is there any power to make withdrawal charges for water taken from the river in its natural state. The Commission's only power to make charges is "for the use of facilities which it may own or operate and for products and services rendered" by such facilities. The Commission plainly does not own or operate the river, as a facility or otherwise, and, therefore, could

make no charge of the kind suggested. This is confirmed as to present industrial, domestic and municipal users (Section 1.3(e)) which flatly states that one of the purposes of the Compact is "to make secure and protect present developments within the states; ... and to apply the principle of equal and uniform treatment to all water users who are similarly situated..."

Committee on Forests and Waters, Report on Pennsylvania Senate Bill No. 350 at 3 (May 23, 1961). Following the Committee's recommendation, the Pennsylvania legislature approved the Final Draft and it was signed by Governor Lawrence on July 7, 1961. In a statement released that day, the Governor provided a further explanation of legislative intent with respect to the new Commission's power to levy water-use charges:

Nowhere in the Compact is there any power to make withdrawal charges for water taken from the river except as Commission improvements provide water not previously available. The Commission's only power to make charges is 'for the use of facilities which it may own or operate and for products and services rendered' by such facilities. The Commission plainly does not own nor operate the river, as a facility or otherwise, and, therefore, could make no charge of the kind suggested. Consequently, Pennsylvania adopts the Compact with the intent and understanding that the Commission shall not have power to impose any charge for water withdrawals or diversions from the Basin *if such withdrawals or diversions could lawfully have been made without charge on the effective date of the Compact.*

*Statement of Gov. Lawrence* at 3 (July 7, 1961) (emphasis added).

None of the four state legislatures added any amendments to the Final Draft since this would have required referral back to the other states for approval of the amended version. *See* Report on Pennsylvania Senate Bill No. 350, *supra*, at 1. However, under Section 1.4 of the Final Draft, Con-

gress was granted a reserve power to add amendments, which would not require state approval, as a condition of federal participation in the joint state enterprise. Section 15.1(b)—the Compact provision at issue here—was added, together with certain other amendments, pursuant to that reserve power at the behest of Secretary of the Interior Morris Udall. The purpose of Section 15.1(b), according to Secretary Udall, was "to clarify the intent of Section 3.7." Letter to Senator James Eastland from Morris Udall, Secretary of the Interior, on H. J. Res. 225 Addendum at 2 (Aug. 15, 1961) (setting forth proposed amendments to the Compact). Indeed, the amendment—which exempted from water-use charges, withdrawals which "could lawfully have been made without charge on the effective date of the Compact"—was a verbatim transposition of Governor Lawrence's statement regarding Pennsylvania's understanding into an express provision of the Compact. Secretary Udall also noted that the general structure of the Compact and the several federal amendments were the product of lengthy discussions with representatives of the signatory states. Largely because the states had finally reached an agreement, thereby ending a long history of failed attempts to develop a Basin-wide plan, and because of the "urgent need for resource planning and development in this area of mounting congestion," Secretary Udall recommended approval of the Compact and the proposed federal amendments. *See* Udall letter to Sen. Eastland, *supra*, at 3. This sense of historic achievement was echoed by Senator Joseph Clark of Pennsylvania. *See* Hearings on Senate Bill No. 856 at 42 (Aug. 24, 1961). Congress approved the Compact, and it was signed by President Kennedy on November 2, 1961.

B. *The Purposes of Section 15.1(b)*:

The foregoing recital sets out the provenance of the *language* of Section 15.1(b). It also suggests in a generalized way the *purposes* underlying the language. Translating those general purposes into a detailed blueprint of what the Pennsylvania legislature, Governor Lawrence, Secretary Udall and Congress had in mind is less easy. In

that sense, the Court of Appeals' prediction that it would be difficult "to divine legislative intent ... when the legislature acted two decades past and left no clear trace of its designs," 641 F.2d at 1100, has to some extent been borne out. But, as the Court of Appeals added, "it is doubtful whether the actual purpose of the Congress need be established." *Id.* at 1100. Instead, it is sufficient that the Commission come forward with some legitimate public purpose which may reasonably have been entertained by Congress. *Id.* at 1097. *See also Railroad Retirement Bd. v. Fritz*, 449 U.S. 166, 179, 101 S.Ct. 453, 461, 66 L.Ed.2d 368 (1980).

After considering the parties' lengthy submissions and hearing oral argument, I am satisfied that it is possible to identify certain proper governmental purposes which Section 15.1(b) was not only presumptively but probably designed to serve.

Perhaps the most obvious purpose animating the Congress that added Section 15.1(b) was the imposition of some limitation on the rate-making power of DRBC. The legislative history of the Compact shows that as the Delaware River Basin Advisory Committee sought to frame the powers of a regulatory agency for the Basin, it faced considerable opposition from industry groups which had enjoyed free use of Basin water. *See* Memorandum in Support of the Motion for Summary Judgment filed by Intervenors Bethlehem Steel Corp., Bethlehem Mines Corp., and U. S. Steel Corp. at 18–24. Early drafts of the Compact had contained provisions for delegating a broad authority to impose water use charges on *all* users. Eventually, these plans were discarded in favor of a more limited approach. *Compare* Proposed Federal-State Compact (Draft "B") § 10.9 (Mar. 1, 1960) *with* Interstate-Federal Compact (Final Draft) §§ 11.3; 12.1; 14.1(a)(2). It was generally agreed at the time of the Compact's enactment that the principal financing of DRBC's projects would come from grants made by the signatory states and the federal government rather than from DRBC-imposed water-use charges. *See* Udall letter to Sen. Eastland, *supra*, at 1 (noting that DRBC projects would be financed "through loans, grants or the issuance of bonds"); Report on Pennsylvania Senate Bill No. 350, *supra*, at 4. *See also* Compact §§ 12.1 and 14.1(a)(2). Moreover, the remarks of Governor Lawrence discussed earlier suggest quite clearly that DRBC's financing authority was limited so that those groups which had established positions in the Basin could continue to withdraw Basin water without charge at their anticipated levels of use. *See Statement of Gov. Lawrence, supra.*[5]

Thus, it is clear that the framers of the Compact made a characteristically legislative judgment about the type of financing authority which would be conferred on the new Commission. Such a decision to grant only limited rate-making authority must be viewed against the background of issues and considerations which produced the Compact. It is important to bear in mind the unusual and untested character of what was to be undertaken by DRBC. In order "to encourage and provide for the planning, conservation, utilization, development, management and control of the water resources of the basin," Compact § 1.3(e), the Compact's authors evidently considered it necessary to preserve expressly the pre-1961

---

5. In addition, the Section 15.1(b) exemption from water withdrawal charges for all pre-1961 users operated to preserve in *status quo ante* the entitlement of all pre-Compact users to withdraw water without charge on a parity with the rights to free use of New Jersey and New York City that were secured by the 1954 Consent Decree and confirmed by Section 3.5 of the Compact. Section 3.5 provides in part:

Except as specifically provided in Sections 3.3 and 3.4 of this article, nothing in this compact shall be construed in any way to impair, diminish or otherwise adversely affect the rights, powers, privileges, conditions and obligations contained in the decree of the United States Supreme Court in *New Jersey v. New York*, 347 U.S. 995 [74 S.Ct. 842, 98 L.Ed. 1127] (1954). To this end, and without limitation thereto, the commission shall not:
. . . .
(b) Impose or collect any fee, charge or assessment with respect to diversions of waters of the basin permitted by said decree. . . .

users' privilege of free water use so that the fledgling Commission's chances of winning the cooperation of existing users would be increased.[6]

Put another way, the enactment of Section 15.1(b) could reasonably have been grounded on a legislative judgment that to adopt the Compact without exempting existing users from water-use charges would court an unacceptable risk of diminishing DRBC's prospects for successfully administering the water resources of the Basin. To have omitted such a requirement for apportioning financing burdens would have put a cloud over DRBC's early efforts to establish a workable plan for development and conservation. It is clear from Section 1.3(c) of the Compact and from the legislative history that promotion of cooperative planning was one of the Compact's general purposes. *See* Water Research Foundation, *Brief Report, supra,* at 3–6, 21. Thus, the addition of Section 15.1(b) can reasonably be seen as an attempt to ensure the cooperation of affected user groups whose expertise and information might be necessary to DRBC's early efforts to administer the Basin's resources. Similarly, Section 15.1(b) appears to have been prompted in some measure by a desire to avoid dislocations which might undermine the development of orderly plans for water resource management and the production of reliable predictions of expected growth and industrial use.

A corollary purpose, related to the principal purpose identified in the legislative history of limiting DRBC's rate-making power, was the preservation of pre-existing development and the protection of the significant reliance interests of those who withdrew Delaware River Basin water without charge prior to the creation of DRBC. Such a purpose seems to be clearly consonant with the general goal stated in Section 1.3(e) of the Compact of "mak[ing] secure and protect[ing] present developments within the states."[7] *See also* Pennsylvania Senate Committee Report on Bill No. 350, *supra,* at 3.

In the case at hand, it is difficult to catalogue with precision the full range of reliance interests developed by pre-Compact users which Section 15.1(b) sought to protect. But, it is a fair inference that these interests extended beyond the levels of actual water use in 1961 to include a substantial reliance by these users on their full "legal entitlement"—defined by Resolution 74–6—as of the Compact's enactment. An industrial enterprise which as of 1961 had

---

**6.** In the course of its opinion, the Court of Appeals considered an argument advanced by counsel for DRBC that a particular purpose of the exemption in Section 15.1(b) and Resolution 74–6 was the preservation of pre-Compact rights to free water use embodied in state permits as part of state water allocation systems (e.g., Philadelphia's permit). Citing language from Section 10.1 of the Compact which gives DRBC power to "regulate and control withdrawals and diversions" of Basin water, the Court of Appeals reasoned that since the Compact conferred on DRBC broad powers to regulate withdrawals and thereby to affect pre-Compact rights, the contention that Section 15.1(b) embodies Congress' tacit "solicitude for the state allocation systems" was implausible. 641 F.2d at 1099. However, Article 10, taken as a whole, contemplates only a very qualified supersession of state allocation systems: Drought—emergencies apart, DRBC is given authority to "control withdrawals" only in "protected areas" of the Basin found to be endangered by water shortages. DRBC's decision to designate an area as "protected" can be made only after public hearings, and the determination of DRBC is subject to judicial review.

*See* §§ 10.2; 10.6. *See also* § 10.4. Thus, rather than conferring a broad regulatory power antithetic to Section 15.1(b)'s reservation of authority, Article 10 is clearly consistent with Section 15.1(b) in that the framers of the Compact were careful to restrict DRBC's powers so that it would intrude in only a narrowly defined manner on the rights of pre-Compact users.

**7.** Section 1.3(e) provides:

In general, the purposes of this compact are to promote interstate comity; to remove causes of present and future controversy; to make secure and protect present development within the states; to encourage and provide for the planning, conservation, utilization, development, management and control of the water resources of the basin; to provide for cooperative planning and action by the signatory parties with respect to such water resources; and to apply the principal of equal and uniform treatment to all water users who are similarly situated and to all users of related facilities, without regard to established political boundaries.

large water-use requirements would expectably have made future projections concerning the continued maintenance of its facilities and the possible expansion of existing facilities based not only on its then current level of water withdrawals but also on the basis of its anticipated needs and on the likely availability and cost of water. Thus, such an enterprise would have relied heavily on continued access to free water up to the amount of its "legal entitlement" in planning its long-term development. In much the same way, a municipality on the banks of the Delaware would have grounded its decisions concerning plans for anticipated population growth or the expansion of municipal services not only on its 1961 level of use but also on its expectations about the continued availability of free water up to a specified amount. A wide array of planning decisions relating to zoning, water supply, sewage treatment, etc. would have been reasonably based on and would have substantially relied upon the availability of free water. A significant change in these expectations could have caused serious economic and political dislocations.

For the most part, courts have found that governmental purposes such as the ones canvassed above are proper grounds for insulating enterprises already *in situ* from the burdens of a newly adopted regulatory scheme.[8]

C.  *The Rationality of Resolution 74–6*:

With this review of the legislative purposes of Section 15.1(b) as preface, I turn now to the central question whether the classifications adopted in DRBC Resolution 74–6 are rationally related to the accomplishment of the Compact's purposes.

For the first ten years of its management of the Basin, DRBC did not seek to exercise its Section 3.7 power to impose water-use charges. Then, in 1971, DRBC began the process of developing a plan for levying such charges to help defray the cost of maintaining its water-storage facilities. *See* Resolution 71–4. There followed a series of public hearings which culminated in the adoption of Resolution 74–6 in 1974. The task of developing the Resolution was carried out principally by William Miller, general counsel to DRBC during this period. As Mr. Miller observed, the first difficulty for DRBC was interpreting the Compact provision, Section 15.1(b), that exempted from water-use charges withdrawals which "could lawfully have been made without charge" when the Compact took effect. *See* Public Hearing of DRBC, Testimony of William Miller, Tr. at 7 (Mar. 26, 1974).

The Resolution, as finally adopted, established two principal criteria for measuring the extent of a user's entitlement to continued free water use. A user's legal entitlement could be established either by the amount of water it was entitled to withdraw without charge under a valid state permit held at the time of the Compact's enactment or by the amount of water which the user had the physical capacity to withdraw when the Compact was enacted. *See* Resolution 74–6, § 5–1.3(b)(i) and (ii).[9]  Be-

---

**8.** For example, see *Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456, 101 S.Ct. 715, 66 L.Ed.2d 659 (1981), sustaining a Minnesota environmental protection statute, which in anticipation of the entry into the retail milk market of "throwaway" plastic milk containers, banned retail milk sales in non-returnable, non-refillable containers, but exempted from the ban containers of less than 50% plastic content —i.e., paperboard milk containers which were already in wide use. Acknowledging Minnesota's interest in reducing "economic dislocation" in the dairy industry, *id.* 101 S.Ct. at 725, and in protecting the " 'substantial reliance interests in continued operation' " of paperboard container manufacturers, *id.* 101 S.Ct. at 726, the Court ruled that: "The Equal Protection Clause does not deny the State of Minnesota the authority to ban one type of milk container conceded to cause environmental problems merely because another type, already established in the market, is permitted to continue in use." *Id.* 101 S.Ct. at 725.

**9.** Apparently, many pre-Compact users were not required to and, hence, did not make their withdrawals pursuant to a state permit. Consequently, in order to measure the amount of water that these users "could lawfully have [withdrawn] without charge," DRBC established the user's actual pumping capacity at the time of the Compact's enactment as the controlling index. *See* Miller Testimony, *supra,* Tr. at 7–9.

cause the exemption provision of the Compact conferred, in Mr. Miller's words, "a special privilege," DRBC insisted that the scope of the exemption be strictly construed and, accordingly, a user's entitlement to free water use was determined by the lesser of the two criteria described above. *See* Miller Testimony, *supra*, Tr. at 7. A third benchmark—based upon a "seven-day, ten-year, low-flow criterion"—is essentially a provisional method of measuring legal entitlement that is reserved for emergency periods of water shortage. *Id.* at 8; Resolution 74–6, § 5–1.3(b)(iii). As counsel for DRBC explained at oral argument, this low-flow provision is designed to ensure that during times of drought, users will not be injured by unreasonable diversions by upstream users. Thus, the principal methods chosen by DRBC for measuring a user's right to free water use are the user's entitlement under a valid state permit or the user's actual pumping capacity, whichever is less. The question then is whether these two criteria constitute a rational means to further the Compact purposes identified earlier.

In its opinion remanding the case for further proceedings, the Court of Appeals expressed considerable doubt about the propriety of exempting pre-Compact users from charges for water diversions within their "legal entitlement" but exceeding their pre-Compact actual use. That dubiety was rooted in the rationale for Section 15.1(b) which, in sustaining Section 15.1(b) and Resolution 74–6, this court had previously articulated—namely, that "Congress may well have supposed that, broadly speaking, the Delaware River and its tributaries met the water use needs of the region as of 1961, and that most Commission projects aimed at enlarged and more equitable water allocation would be geared to meeting needs developing after the effective date of the Compact." 474 F.Supp. at 1255. The Court of Appeals properly observed that:

> In addition, because many pre-1961 users had not maintained records of their actual water use in 1961 and not all pre-1961 users had recorded permits, the Commission determined that if a pre-Compact user's entitlement could

If Section 15.1(b) reflects a policy that users of Basin water who place demands on Basin resources exceeding those made in 1961 should pay for Commission projects undertaken to satisfy those demands, then Resolution 74–6, by forcing some users to pay those costs while exempting others, appears to be an arbitrary, rather than a rational, implementation of that policy.

641 F.2d at 1098 (footnote omitted).

After rejecting this narrow rationale, the Court of Appeals expressed some further misgivings about the rationality of Resolution 74–6. Two features of the system of water-use charges and exemptions established by the Resolution prompted the Court of Appeals' concern: (a) the broad scope of the scheme, which exempts not only a user's actual water usage as of 1961, but also the full "legal entitlement," and (b) the apparently permanent character of the exemptions. Both appeared, in the Court of Appeals' view, to lack a rational basis. *See* 641 F.2d at 1098–99.

As to the first concern, the broader light shed by the record developed on remand has made it apparent that this court's initial perception of the purposes of Section 15.1(b) was too narrow. As developed in Part I(B) of this Opinion, it now appears probable that Congress, taking its cue from Secretary Udall and Governor Lawrence and the Pennsylvania legislature, sought to protect not merely the existing but the anticipated water uses of those industries and municipalities which as of 1961 were taking water from the Delaware and were "legally entitled" to do so. As I noted earlier, Resolution 74–6 limits a pre-1961 user's legal entitlement to the user's actual physical pumping capacity if that amount is less than the full extent of its state permit. Given that scheme, the scope of a pre-1961 user's reliance upon free water is matched

> not be established as of 1961, a user could submit proof of entitlement based on permits or pumping capacity as of 1971. *See* Miller Testimony, *supra*, Tr. at 8; Resolution 74–6, § 5–1.3(a).

with a reasonable degree of precision by the terms of the DRBC rule. This is because the rule generally operates to safeguard a user's concrete investment in a level of pumping capacity sufficient to meet the user's anticipated needs but, when that capacity is less than a user's permit level, the rule does not protect the more abstract expectations of free entitlement up to the full amount of the user's state permit.[10] Thus, the rule operates in a relatively restrictive manner to limit the exemption from water-use charges. But, it nevertheless serves to protect significant reliance interests. Indeed, as a DRBC staff report—issued after public hearings were held on the Resolution—explained, an important part of the rationale for the Resolution's differential treatment of pre-1961 and post-1961 users was that "[i]ndustrial newcomers to the basin water resources do not have a vested right established at the time of Compact enactment since they were not on the river and dependent upon an established supply." DRBC Staff, *Water Supply Pricing Hearing Issues—Part II*, p. 14 (May 1974).

With respect to the second concern voiced by the Court of Appeals, it is clear that the Compact exemption from water—use charges for pre-1961 uses, as implemented by the DRBC Resolution, is not wholly permanent. By prohibiting the transfer of free water use rights, *see* Resolution 74–6, § 5–2.1(d), DRBC has made it likely that some significant number of pre-1961 uses will not be perpetually exempt since the initial user may go out of existence and be replaced by a new user which will not be permitted to acquire the former entitlement. *See Water Supply Pricing Hearing Issues—Part II, supra,* at 12. As the identity of users changes over time, there will be a gradual decrease in the total amount of water use exempted from withdrawal charges. *See* Affidavit of Robert L. Goodell, Schedule "B" at 1, 3, 6 and 14 (noting

(a) pre-1961 users which were sold to successors which do not enjoy an entitlement and therefore pay charges; and (b) pre-1961 users which have exceeded their entitlement and therefore pay charges).

Of course, given the terms of Resolution 74–6, some users—for example, municipalities such as Philadelphia—are likely to maintain permanently their present exemptions from water withdrawal charges. Plainly, insofar as Resolution 74–6 may be expected to "grandfather" the free water-use of some pre-Compact users on a permanent basis, it must be carefully reviewed. And the Court of Appeals is certainly right that the Supreme Court differentiates between temporary and permanent grandfathering—a differentiation exemplified by *New Orleans v. Dukes,* 427 U.S. 297, 96 S.Ct. 2513, 49 L.Ed.2d 511 (1976). However, the Supreme Court has not said that permanent grandfathering is *per se* bad. Compare *Minnesota v. Clover Leaf Creamery Co., supra,* 101 S.Ct. at 726; *United States v. Maryland Savings-Share Ins. Corp.,* 400 U.S. 4, 6, 9, 91 S.Ct. 16, 17, 19, 27 L.Ed.2d 4 (1970)—and note particularly that *New Orleans v. Dukes, supra,* expressly overruled *Morey v. Doud,* 354 U.S. 457, 77 S.Ct. 1344, 1 L.Ed.2d 1485 (1957) (invalidating an Illinois statute imposing regulations on all credit card institutions other than American Express Company). The upshot would seem to be that permanent grandfathering calls for somewhat more exacting insistence on the rationality of the classification than temporary grandfathering. In the instant case, if, as this court is persuaded, Resolution 74–6 is a rational implementation of Section 15.1(b) as properly understood, that ends the inquiry, for Section 15.1(b) is itself a grandfathering provision—a provision not challenged in the Court of Appeals and not open to challenge here.

Seen in this light, the discrimination between pre-1961 and post-1961 users estab-

---

**10.** Whether, with respect to a user such as Philadelphia which had a state permit but whose 1961 pumping capacity was less than the amount specified in the permit, Resolution 74–6 can validly qualify the apparent breadth of Section 15.1(b) by restricting free water use to the permittee's 1961 pumping capacity, is an issue not posed by this litigation. *See* 641 F.2d at 1098 n.22.

lished by Resolution 74–6 does not treat identical groups differently, but rather establishes a financing scheme which respects two significant distinctions between these groups: First, it acknowledges the extent to which the cooperation of existing users was necessary to the early period of DRBC's work; and, secondly, it recognizes the different degree of reliance interest in free water use. Thus, the classification drawn in the Resolution between pre-1961 and post-1961 users is not one that is "wholly without any rational basis," *United States Department of Agriculture v. Moreno*, 413 U.S. 528, 538, 93 S.Ct. 2821, 2827, 37 L.Ed.2d 782 (1973). Instead, this classification appears to help promote the general goals of the Compact and it directly fulfills the express differentiation intended and accomplished by Section 15.1(b).

To be sure, these are somewhat speculative reasons. But the Supreme Court has made clear that it is not necessary under the applicable constitutional test that this water use charge system be the best or the most fair, or even for the legislative judgment to be based on accurate assumptions. *See Railroad Retirement Bd. v. Fritz, supra*, 101 S.Ct. at 459; *Schweiker v. Wilson*, 450 U.S. 221, 234–235, 101 S.Ct. 1074, 1083, 67 L.Ed.2d 186 (1981). Instead, it is sufficient that the legislature could have reasonably entertained these concerns and sought to address them through this classification. In the same way as in *Minnesota v. Clover Leaf Creamery, supra*, the Congress and DRBC were entitled to believe that this method of financing future Basin improvements would better achieve the goal of efficient water resource management by enlisting the cooperation of existing users, protecting established reliance interests from disruption, and avoiding potential economic dislocation. This may not represent the *best* method, but the rational relation-

ship test does not impose on legislatures the obligation to devise a flawless or empirically accurate scheme.[11] *See Murillo v. Bambrick*, 681 F.2d 898, 911 (3d Cir. 1982). As the Supreme Court has stated:

> In the area of economics and social welfare, a State [and correspondingly under the Fifth Amendment the federal government] does not violate the Equal Protection Clause merely because the classifications made by its laws are imperfect. If the classification has some 'reasonable basis' it does not offend the Constitution simply because the classification 'is not made with mathematical nicety or because in practice it results in some inequity.'

*Schweiker v. Wilson, supra*, 101 S.Ct. at 1082–83 (quoting *Dandridge v. Williams*, 397 U.S. 471, 485, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970)) (citations omitted).

In sum, I find that the system of water-use charges and exemptions found in DRBC Resolution 74–6 differentiates among users of Delaware River Basin water in a manner that is rationally related to the goals of preserving existing development and protecting significant reliance interests that are embodied in the provisions of the Compact. It was for this reason that, on March 26, 1982, I entered an order granting summary judgment in favor of plaintiff DRBC and plaintiff intervenors, and denying defendants' cross-motion for summary judgment.

11. This case differs significantly from the recent decision of the Supreme Court in *Zobel v. Williams*, —— U.S. ——, 102 S.Ct. 2309, 72 L.Ed.2d 672 (1982). There, the Court, applying the rational relationship test, struck down an Alaska program which distributed dividends from a state mineral resources fund to adult residents, with the amount of the dividend de-

termined by duration of residency. Unlike the instant case, in *Zobel* no incumbent class had built up any reliance interest whatsoever in an existing set of rights or privileges which would be adversely affected by the state program. Accordingly, the legislative purpose of protecting such interests—which is of decisive importance for this case—was not present in *Zobel*.