**TEXACO REFINING AND MARKETING, INC.,**
Plaintiff,

v.

**DELAWARE RIVER BASIN COMMISSION,**
Defendant.

**CHEVRON U.S.A. INC., Plaintiff,**

v.

**DELAWARE RIVER BASIN COMMISSION,**
Defendant.

**Civ. A. Nos. 89–695–SLR, 90–353–SLR.**

United States District Court,
D. Delaware.

June 11, 1993.

Richard D. Allen, and R. Judson Scaggs, Jr., of Morris, Nichols, Arsht & Tunnell, Wilmington, DE, for plaintiff Texaco Refining and Marketing Inc.

Richard D. Allen, of Morris, Nichols, Arsht & Tunnell, Wilmington, DE (R.W. Williams, G. Alan Kramer, Marsha A. Penn, of Chevron U.S.A. Inc., of counsel), for plaintiff Chevron U.S.A. Inc.

Kevin P. Maloney, of Delaware Dept. of Justice, Wilmington, DE (David J. Goldberg, Gen. Counsel of Delaware River Basin Com'n, West Trenton, NJ, of counsel), for defendant.

## OPINION

SUE L. ROBINSON, District Judge.

### I. INTRODUCTION

In these two actions, the plaintiff corporations seek review of determinations by the Delaware River Basin Commission ("DRBC") that the plaintiffs are subject to charges for withdrawing water from the Delaware River Basin ("Basin").[1] Under the Delaware River Basin Compact ("Compact"), subject to exemptions covered under a "grandfather" provision, the DRBC may charge for withdrawal of water from the Basin. The plaintiff corporations contend that they are covered under the "grandfather" provision, while the DRBC argues to the contrary. Both the plaintiff corporations and the DRBC have filed motions for summary judgment. Because the Court finds that the plaintiff corporations fall within the strictures of the "grandfather" provision, the Court will grant summary judgment for the plaintiff in each action.

---

1. The plaintiff corporations filed these actions as complaints seeking declaratory and injunctive relief. However, the Court has already determined that this action is an appeal from the DRBC. *See* *Texaco*, D.I. 17, slip op. at 3–6, (D.Del. July 31, 1990). *See also Delaware Water Emergency Group v. Hansler*, 536 F.Supp. 26, 40 (E.D.Pa. 1981), *aff'd*, 681 F.2d 805 (3d Cir.1982).

## II. BACKGROUND

### A. THE COMPACT

In 1961, the states of New York, New Jersey, Pennsylvania, and Delaware, entered into the Compact. After approval by all the states who were party to the Compact, Congress modified and then ratified the Compact, which subsequently was signed by the President. The purpose of the Compact was to create a regional regulatory agency which would manage and control the waterways in the Basin. The Compact established the DRBC and gave the DRBC the power to impose charges for withdrawal of water from waterways under control of the DRBC.

Section 3.7 of the Compact provides as follows:

The commission may from time to time after public notice and hearing fix, alter and revise rates, rentals, charges and tolls and classifications thereof, for the use of facilities which it may own or operate and for products and services rendered thereby, without regulation or control by any department, office or agency of any signatory party.

Section 15.1(b) of the Compact provides as follows:

No provision of § 3.7 of the Compact shall be deemed to authorize the Commission to impose any charge for water withdrawals or diversions from the Basin if such withdrawals or diversions could lawfully have been made without charge on the effective date of the Compact.

In 1974, the DRBC adopted Resolution 74–6, which "implemented a system of rates and exemptions for the use of the surface waters of the Delaware." *Delaware River Basin*

*Commission v. Bucks County Water & Sewer Authority,* 641 F.2d 1087, 1089 (3d Cir. 1981). As required under § 15.1(b) of the Compact, Resolution 74–6 provided for Certificates of Entitlement to withdraw water free of charge which would be issued to users who had been making withdrawals or diversion without charge in 1961.

In Resolution 74–6 § 5–2.1(f), the DRBC provides for transfers of the Certificates of Entitlement. Section 5–2.1(f) provides, in pertinent part:

(f) A certification of entitlement may be transferred in connection with a corporate reorganization within any of the following categories:

. . . . .

(ii) whenever the transfer is an incident of a statutory merger or consolidation pursuant to the corporation laws of any state, the District of Columbia or the United States . . .[2]

The DRBC was acting within the scope of its authority in adopting Resolution 74–6. *Borough of Morrisville v. Delaware River Basin Commission,* 399 F.Supp. 469 (E.D.Pa.1975), *aff'd per curiam,* 532 F.2d 745 (3d Cir.1976); *Bucks County Water & Sewer Authority,* 641 F.2d 1087, 1091 (3d Cir.1981).

The instant litigation arose as a result of the corporate metamorphosis of both of the plaintiff corporations. As will be developed in the discussion below, the plaintiffs in each of these actions claim a right to Certificates of Entitlement which in the case of Chevron U.S.A. Inc. had been held by Gulf Oil Corporation for the Philadelphia Refinery and in the case of Texaco Refining and Marketing Inc. had been held by Getty Refining and

---

**2.** There are three other situations covered in section 5–2.1(f), and they provide as follows:

(i) whenever property is transferred to a corporation by one or more persons solely in exchange for stock or securities of the same corporation, provided that immediately after the exchange the same person or persons are in control of the transferee corporation, that is, they own 80% of the voting stock and 80% of all other stock of the corporation;

. . . . .

(iii) whenever the transfer is included in a transfer by a corporate holder of a certificate

of entitlement of all or a part of its assets to another corporation if immediately after the transfer the transferor or one or more of its stockholders, or any combination thereof, are in control of the corporation to which the assets are transferred, and such transfer is in exchange solely for stocks or securities of the transferee corporation as a party to a reorganization within the meaning of Section 354 or Section 361 of the Internal Revenue Code; or

(iv) where such transfer is required merely as a result of a change of the name, identity, form or place of organization of a corporate holder of a certificate of entitlement.

Marketing Company for the Delaware City Refinery. The plaintiffs contend that these rights are preserved under Resolution 74–6 § 5–2.1(f)(ii) as a result of the statutory mergers of the respective corporations.[3] The DRBC, after hearings on the matters, terminated the Certificates of Entitlement held by the plaintiffs on the grounds that the transactions resulting in the present makeup of the plaintiff corporations were not covered by § 5–2.1(f)(ii). The DRBC, in interpreting and applying § 5–2.1(f), formulated an "ownership and control" test to determine whether the disputed transactions constituted "corporate reorganizations" under § 5–2.1(f). The DRBC found that the plaintiff corporations were no longer under the same ownership and control as the corporations which had been issued the respective Certificates of Entitlement. The DRBC now seeks payment from the plaintiff corporations for withdrawing water from the Basin.

### B. TEXACO—THE DELAWARE CITY REFINERY

Texaco Refining and Marketing Inc. ("TRMI"), the current owner of the Delaware City Refinery, claims the right to the Certificate of Entitlement which had been held by Getty Oil Company Inc. The following undisputed facts illustrate the corporate transactions upon which TRMI bases its claim.

Getty Oil Company Inc. ("Getty Inc."), which is a subsidiary of Getty Oil Company ("Getty Co."), owned and operated the Delaware City Refinery. (*Texaco*, D.I. 9, Exhibit 1) Because the Delaware City Refinery was able to withdraw and use water from the Basin free of charge in 1961, on July 15, 1976, the DRBC issued Certificates of Entitlement to Getty Co. *Id.* On December 30, 1976, Getty Inc. changed its name to Getty Refining and Marketing Company ("GRMC"). (D.I. 29 at 17)

On January 6, 1984, Texaco Inc. entered into a Merger Agreement with Getty Co. (D.I. 43, Exhibit 7) Under the merger agreement, a subsidiary of Texaco Inc. would make a tender offer for shares in Getty Co. and subsequently merge with Getty Co. *Id.* at 2. As a result of the tender offer, Texaco Acquisitions Inc., a subsidiary of Texaco Inc., purchased over 90% of the common stock of Getty Co. (D.I. 43, Exhibit 2 at 2) Texaco Acquisitions Inc. assigned this stock to its subsidiary, Texaco Holdings Inc. *Id.* On February 17, 1984, Texaco Holdings Inc. and Getty Co. were merged pursuant to 8 Del.C. §§ 103, 253, with Getty Co. as the surviving corporation. (D.I. 43, Exhibit 10 at 1) GRMC continued to operate the Delaware City Refinery. (D.I. 43, Exhibit 2 at 3) On December 19, 1984, GRMC changed its name to TRMI. (D.I. 43, Exhibit 11)

### C. CHEVRON—THE PHILADELPHIA REFINERY

Chevron U.S.A. Inc., the current owner of the Philadelphia Refinery, claims the right to the Certificate of Entitlement which had been held by Gulf Oil Corporation. The following undisputed facts illustrate the corporate transactions upon which Chevron U.S.A. Inc. bases its claim.

Gulf Oil Corporation, a Pennsylvania corporation, owned and operated the Philadelphia Refinery. (*Chevron*, D.I. 11A, Exhibit II at 5) Because the Philadelphia Refinery was able to withdraw and use water from the Basin prior to 1961, the DRBC issued a Certificate of Entitlement to Gulf Oil Corporation on July 15, 1976. *Id.*

On January 18, 1984, Gulf Oil Corporation became a wholly owned subsidiary of Gulf Corporation, a Delaware corporation, by way of a merger with another subsidiary of Gulf Corporation. (D.I. 11B, Exhibit VI, C7)

---

**3.** The plaintiffs also contend that § 15.1(b) of the Compact exempted all "withdrawals or diversions" being made at the time of the passage of the Compact. The plaintiffs construe this clause to provide an exemption with regard to the use, not the user. Plaintiffs claim that because they continue to use the water as it had been used in 1961, the exemption should apply regardless of the owner of the facility. The Court rejects this argument. The construction proffered by plaintiffs appears to have been put to rest in the *Bucks County Water & Sewer Authority* opinions, wherein the Third Circuit and the Eastern District of Pennsylvania consistently referred to the exemption in terms of users, and not uses. *Bucks County Water & Sewer Authority*, 641 F.2d 1087; 545 F.Supp. 138.

Gulf Oil Corporation survived the merger, retaining all property which it had held prior to the merger, including the Certificate. *Id.*

In March 1984, Gulf Corporation entered into a Merger Agreement with two Delaware Corporations, Standard Oil Company of California ("SOCAL") and its subsidiary, Social Acquisition Corporation. (D.I. 11B, Exhibit VI, C8 at A-1) Under the merger agreement, Socal Acquisition would purchase 30,-500,000 shares of Gulf Corporation which were held by Gulf Corporation. *Id.* Socal Acquisition would then make a tender offer of $80 per share for the outstanding shares, subject to a minimum of 85,000,000 shares. *Id.* Gulf Corporation would then be merged into Socal Acquisition and become a subsidiary of SOCAL. *Id.*

As a result of the tender offer, Socal Acquisition obtained approximately 82% of the outstanding common stock of Gulf Corporation. *Id.* In June 1984, Socal Acquisition Corporation merged into Gulf Corporation, with Gulf Corporation as the surviving corporation. (D.I. 11A, Exhibit 2 at 10) Gulf Corporation then became a wholly owned subsidiary of SOCAL. *Id.* This merger occurred pursuant to Delaware law. (D.I. 11B, Exhibit VI, C8 at A-2) SOCAL subsequently changed its name to Chevron Corporation. (*Id.,* C9 at 1)

On July 1, 1985, Chevron U.S.A. Inc., a California corporation, merged with and into Gulf Oil Corporation, with Gulf Oil Corporation as the surviving corporation. *Id.,* C10. Thus, Gulf Oil Corporation acquired all assets and liabilities of Chevron U.S.A. Inc. as well as maintaining its own assets, including the Philadelphia Refinery. *Id.* The merger occurred pursuant to Pennsylvania law. *Id.* Gulf Oil Corporation then changed its name to Chevron U.S.A. Inc. *Id.* at 3.

In August 1985, Gulf Corporation merged into Chevron U.S.A. Inc. *Id.,* C11.

## D. THE DRBC DECISIONS

Both Texaco and Chevron notified the DRBC of the relevant corporate transactions.

After conducting hearings on the matters, the DRBC terminated the Certificates of Entitlement for both the Philadelphia and Delaware City Refineries. *See* DRBC Decision No. 89-24, Decision 92-1 (*Texaco,* D.I. 9, Exhibit 1; D.I. 43, Exhibit A),[4] DRBC Decision No. 90-6 (*Chevron,* D.I. 11A, Exhibit II).

The rationale of the DRBC decisions terminating the Certificates of Entitlement is similar in both cases. The DRBC reasoned that because the exemptions required under § 15.1(b) of the Compact constituted special privileges, the DRBC must interpret the exemptions strictly. The DRBC also concluded that it must strictly interpret Resolution 74-6 § 5-2.1, which provides for transfer of the Certificates of Entitlement after a corporate reorganization.

In reaching its conclusions, the DRBC relied upon the opinion of the United States Court of Appeals for the Third Circuit in *Bucks County Water & Sewer Authority,* 641 F.2d 1087 (3d Cir.1981), and the opinion of the United States District Court for the Eastern District of Pennsylvania after remand by the Third Circuit, *Bucks County Water & Sewer Authority,* 545 F.Supp. 138 (E.D.Pa.1982). Both of these courts, in addressing an equal protection challenge to the application of Resolution 74-6, expressed concern regarding the apparent permanent nature of the exemptions provided in § 15.-1(b) of the Compact. 641 F.2d at 1098 (noting that the grandfather provision could violate the equal protection clause, "Resolution 74-6 grants a *permanent* exemption for pre-1961 users to the extent of their 'legal entitlement.' Nothing in the record suggests that the Commission some day will alter this exemption."); 545 F.Supp. at 147 (holding that Resolution 74-6 did not violate the equal protection clause and noting that "it is clear that the Compact exemption from water-use charges for pre-1961 uses, as implemented by the DRBC Resolution, is not wholly permanent. By prohibiting the transfer of free water use rights, *see* Resolution 74-6 § 5-2.1(d), DRBC has made it likely that some

---

**4.** This Court previously remanded the Texaco case to the DRBC for further hearings on the merger-consolidation issue, which was not presented during the initial hearing on revocation.

(*Texaco,* D.I. 42) On remand, the DRBC reaffirmed its prior decision. (*Texaco,* D.I. 43, Exhibit A, Decision 92-1)

significant number of pre–1961 uses will not be perpetually exempt since the initial user may go out of existence and be replaced by a new user which will not be permitted to acquire the former entitlement.").

The DRBC reasons that because the exemption is a special privilege, which has been accorded private entities in conflict with the public interest, it should be interpreted against the private interest to require termination of the Certificates when one corporation purchases the majority of the stock of a corporation holding a Certificate without regard to any subsequent statutory merger. The DRBC quotes the Supreme Court in *Stein v. Bienville Water Supply Co.*, 141 U.S. 67, 11 S.Ct. 892, 35 L.Ed. 622 (1891):

> [I]t is a settled rule of construction that, "in grants by the public nothing passes by implication;" and "if, on a fair reading of the instrument, reasonable doubts arise as to the proper interpretation to be given to it, those doubts are to be resolved in favor of the state; and, where it is susceptible of two meanings, the one restricting and the other extending the powers of the corporation, that construction is to be adopted which works the least harm to the State."

*Id.* at 80–81, 11 S.Ct. at 896 (citation omitted).

Thus, the DRBC determined that in strictly construing Resolution 74–6 § 5–2.1(f) it could apply an "ownership and control" test to the corporate transactions at issue. The DRBC reasons that in interpreting the Compact and its own Resolutions it is not bound by accepted principles of corporate law. Under the "ownership and control" test, the DRBC will not permit transfer of a Certificate of Entitlement after a corporate merger if the new corporate entity is not under the same ownership and control as the pre-merger Certificate holder.

In applying the ownership and control test, the DRBC focused on the pre-merger purchases by the plaintiff corporations of a majority of the stock of the parent corporations of the corporations holding the Certificates, not on the subsequent statutory mergers. The DRBC appears to concede that the plaintiff corporations ultimately consummated the mergers in compliance with the Dela-

ware merger statute. *See Texaco*, D.I. 46 at 2–3, 7; *Chevron*, D.I. 23 at 11–13.

With regard to Texaco, the DRBC focused on the January 1984 tender offers and consequent acquisition of 96% of the stock of Getty Co. The DRBC contends that this transaction resulted in a change in the ownership and control of the Certificate holder. The DRBC contends that the subsequent merger of Texaco Holdings Inc. and Getty Co. was not covered under Resolution 74–6 § 5–2.1(f)(ii) because Getty Co. was no longer under the same ownership and control as it had been prior to the sale of its stock.

With regard to Chevron, the DRBC focused on the June 1984 transaction in which Socal Acquisition Corporation acquired 82% of the stock of Gulf Corporation as a result of its tender offer. Similar to the Texaco case, the DRBC contends this transaction resulted in a change in ownership and control of the Certificate holder. As in Texaco, the DRBC reasoned that the subsequent merger of Gulf Corporation and Socal Acquisition Corporation was therefore not the type of merger covered under Resolution 74–6 § 5–2.1(f)(ii) because Gulf Corporation was no longer under the same ownership and control as it had been prior to the sale of its stock.

The DRBC contends that this Court should defer to its interpretation of § 15.1(b) of the Compact and Resolution 74–6 § 5–2.1(f)(ii) under the principles enunciated in *Cooper Development Co. v. First National Bank of Boston*, 762 F.Supp. 1145, 1151 (D.N.J.1991). The *Cooper* court stated that "where statutory language and legislative history do not speak directly to the issue before the Court, the Court must uphold a construction of the statute rendered by the agency entrusted with interpreting it." *Id.* The *Cooper* court relied upon the following passage from the Supreme Court in *Chevron, U.S.A., Inc. v. Natural Resources Defense Council*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984):

> If ... the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an

administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.

*Id.* at 843, 104 S.Ct. at 2781–82. The DRBC contends that the Compact, Resolution 74–6 § 5–2.1(f), and the attendant legislative history do not specifically address the issue before the Court. Thus, the DRBC argues that this Court should adopt the ownership and control test as applied by the DRBC in these cases.

### III. DISCUSSION

#### A. STANDARD OF REVIEW

Where there are no genuine issues of material fact in dispute and both parties move for summary judgment, the court must determine whether either party is entitled to judgment as a matter of law. *See Manetas v. International Petroleum Carriers, Inc.*, 541 F.2d 408, 413 (3d Cir.1976). Because the Court finds after review of the administrative record that the material facts in this case are not in dispute, the Court further finds that summary judgment is appropriate.

#### B. ANALYSIS

While the Court does not take issue with the DRBC's position that Resolution 74–6 should be strictly construed, the Court does disagree with the DRBC's conclusion that strict construction permitted formulation and application of an "ownership and control" test for three reasons.

First, unlike in *Natural Resources Defense Council* and *Cooper*, the statutory provision in this case demonstrates a clear intent to limit the DRBC's power and to preserve the rights of pre–1961 users. Section 15.1(b) of the Compact explicitly grants very broad rights to pre–1961 users and expressly restricts the authority of the DRBC to impose charges on those users. While prior interpretations by the Third Circuit and the Eastern District of Pennsylvania in *Bucks County Water & Sewer Authority* counsel against

permanence in construing the exemption, this Court must interpret the DRBC's authority in light of the restrictive language and intention found in § 15.1(b).

Second, the test is contrary to the language of § 5–2.1(f)(ii), which explicitly provides for the transfer of Certificates "whenever the transfer is an incident of a statutory merger or consolidation pursuant to the corporation laws of any state, the District of Columbia or the United States." The DRBC argues that because the other three exceptions in § 5–2.1(f) all explicitly relate to transfers in the context of corporate reorganizations in which the transferee is under the same ownership and control as the transferor, the Court should effectively revise § 5–2.1(f)(ii) to allow transfer of a Certificate only when there has been "a statutory merger or consolidation between two corporations which are under the same ownership and control." The Court declines the invitation to modify the plain language of the Resolution.[5]

Third, the test, as applied to the pre-merger stock purchases, is contrary to settled principles of corporate law which establish that the corporation, not the stockholders of the corporation, owns the property, rights, and privileges of the corporation. *See, e.g., Pauley Petroleum, Inc. v. Continental Oil Co.*, 231 A.2d 450 (Del.Ch.1967), *aff'd*, 239 A.2d 629 (Del.1968); *Fletcher Cyclopedia of the Law of Private Corporations* § 5100 (1986). "It is an entity distinct from its stockholders even if its stock is wholly owned by one corporation." *Pauley Petroleum, Inc.*, 231 A.2d at 454 (citing *Buechner v. Farbenfabriken Bayer Aktiengesellschaft*, 154 A.2d 684 (Del.Ch.1959) and *Bird v. Wilmington Society of Fine Arts*, 43 A.2d 476 (Del.Ch.1945)). "Once the acquisition has been made the purchasing corporation thereafter has the status of a stockholder of the corporation whose shares it has purchased and nothing more. In other words, the purchasing corporation is not the owner of the assets of the other corporation, but is merely a stockholder with all the incidents of such."

---

**5.** Of the three other exceptions in § 5–2.1(f), one relates to name changes, and the other two concern property or asset transfers. *See* note 2, *supra.* As will be discussed *infra,* mergers are distinct from sales or transfers of assets or property.

*Orzeck v. Englehart,* 195 A.2d 375, 377 (Del. 1963).

The Court, therefore, must reject the ownership and control test in the context of mergers. Because the DRBC has conceded that the mergers in both cases ultimately were accomplished pursuant to statute, the remaining issue is whether the DRBC can terminate Certificates of Entitlement held by publicly traded corporations upon the sale of a majority or controlling block of the stock of that corporation.

■ The plaintiffs contend that the transactions should not be considered in isolation because the tender offers in both cases were pursuant to merger agreements. Plaintiffs are correct that under the applicable Delaware merger statute, 8 Del.C. § 251, a merger can be accomplished through an exchange of cash for stock.[6] The DRBC is also correct, however, that a tender offer is distinct from a merger, and does not implicate the requirements and protections of 8 Del.C. § 251. *See TW Services, Inc. v. Crown et. al,* No. 10427, 1989 WL 20290 at *9 (Del.Ch. March 2, 1989) (public tender offers can be change in control transactions that are functionally similar to merger transactions; under corporation law, board of directors have significant role in mergers and no role in tender offers). Tender offers are fairly common in back-end mergers such as occurred in these transactions. *See* 2 Fox & Fox, Corporate Acquisitions and Mergers, § 27.01 (1992) (successful tender offer frequently followed by proposal of merger).

■ A successful tender offer merely results in the purchase of the stock, not the assets, of a corporation. *See id. See also Fletcher Cyclopedia of the Law of Private Corporations* § 5100 (1986) ("a sale of all of the stock of a corporation, or of a controlling interest, is not a sale of the physical properties or assets of the corporation"). The purchaser holds shares in the corporation, but has no right to the assets, rights, and privileges of the corporation. *See id.* (owner of stock "has not the legal title to, and is not the owner, or entitled to the possession of, any portion of [the corporation's] property or assets"). A statutory merger, on the other hand, results in a combination of the two corporations with the surviving corporation attaining the property, rights, and privileges of the absorbed corporation, as well as retaining its own property, rights, and privileges. *See* 8 Del.C. § 259 (Michie 1991) (new corporation possesses "rights, privileges, powers and franchises as well of a public as of a private nature" of merging corporations); 2 Fox & Fox, Corporate Acquisitions and Mergers, § 23.02 (1992) ("surviving corporation becomes the owner of the properties and rights of the merged companies").

The DRBC concedes that, prior to the sale of the stock in the case of both Chevron and Texaco, the Certificates of Entitlement held by Gulf Oil Corporation and Getty Refining and Marketing Company were valid property of the latter corporations. The disputed transactions resulted in the sale of a majority of the stock of the corporate parents of the corporations holding the Certificates. These transactions, however, merely changed the stockholders of the parent corporations. Thus, there had been no transfer of the Certificates. The corporations which had

---

**6.** The pertinent provisions of 8 Del.C. § 251 (Michie 1991) provide as follows:

(b) The board of directors of each corporation which desires to merge or consolidate shall adopt a resolution approving an agreement of merger or consolidation. The agreement shall state: (1) The terms and conditions of the merger or consolidation; (2) the mode of carrying the same into effect; (3) in the case of a merger, such amendments or changes in the certificate of incorporation of the surviving corporation as are desired to be effected by the merger, or, if no such amendments or changes are desired, a statement that the certificate of incorporation of the surviving corporation shall be its certificate of incorporation; ... (5) the manner of convert-

ing the shares of each of the constituent corporations into shares or other securities of the corporation surviving or resulting from the merger or consolidation and, if any shares of any of the constituent corporations are not to be converted solely into shares or other securities of the surviving or resulting corporation, the cash, property, rights or securities of any other corporation or entity which the holders of such shares are to receive in exchange for, or upon conversion of such shares and the surrender of any certificates evidencing them, which cash, property, rights or securities of any other corporation or entity may be in addition to or in lieu of shares or other securities of the surviving or resulting corporation....

been issued the Certificates as pre–1961 users continued to hold the Certificates and the right to withdraw water from the Basin without charge. As there was no transfer of the special statutory privilege after the change in stockholders, the cases relied upon the DRBC, such as *Stein*, are inapposite.

The DRBC contends that to allow corporations to maintain the Certificates after the majority of their stock is purchased by another party, but to revoke Certificates if there is an outright sale of the facility benefitting from the Certificate, would not make sense. The Court disagrees. Such a distinction is in accord with the nature of corporate law, which clearly distinguishes between a corporation and its stockholders. Under corporate law, the corporate entity has an identity, rights, and privileges which are distinct from those of its stockholders. *See Pauley Petroleum, Inc.*, 231 A.2d at 454. *See generally* 2 Fox & Fox, Corporate Acquisitions and Mergers, § 23.04 (1992); *Fletcher Cyclopedia of the Law of Private Corporations* § 5100 (1986). If all of the corporation's stock changes hands over night, the corporation would maintain all of the rights, privileges, and liabilities it had prior to the change in the composition of the stockholders. *See Fletcher* § 5100. The DRBC's position would create great uncertainty with respect to publicly traded corporations whose stockholders may change daily. Where the corporation sells an asset such as the water use facility, the purchaser does not obtain all of the rights, privileges, and liabilities associated with the asset which had belonged to the seller. *See generally* 2 Fox and Fox, Corporate Mergers and Acquisitions § 23.-03[3] (discussing advantages and disadvantages of purchase of assets as opposed to merger). Thus, there is a clear distinction between a change in the majority control of the stock of a corporation and the sale of one of the corporation's assets.

The transfer of the Certificates occurred as a result of the subsequent statutory merger, which the DRBC concedes was a valid statutory merger. Because the subsequent merger was pursuant to the applicable Delaware law, the merger fits squarely within the requirements of Resolution 74–6 § 5–

2.1(f)(ii). Thus, the Court holds that the DRBC must recognize the transfer of the Certificates of Entitlement and may not charge the plaintiff corporations for the withdrawal of water from the Basin as permitted under the Certificates.

The Court is mindful of the potential evils of permanent exemptions under the "grandfather clause." Absent an express mandate from the sovereign legislatures, however, the DRBC remains constrained by the language of the charging instrument as interpreted consistent with accepted principles of corporate law.

For the foregoing reasons, the Court grants summary judgment in favor of the plaintiffs in each of these actions. The Court will enter an appropriate Order consistent with this Memorandum Opinion.